LEIS ET AL. *v.* FLYNT ET AL.

No. 77–1618.   Decided January 15, 1979

PER CURIAM.

Petitioners, the judges of the Court of Common Pleas of Hamilton County, Ohio, and the Hamilton County prosecutor, seek relief from a decision of the United States Court of Appeals for the Sixth Circuit.  The Court of Appeals upheld a Federal District Court injunction that forbids further prosecution of respondents Larry Flynt and Hustler Magazine, Inc., until respondents Herald Fahringer and Paul Cambria are tendered a hearing on their applications to appear *pro hac vice* in the Court of Common Pleas on behalf of Flynt and Hustler Magazine.  Petitioners contend that the asserted right of an out-of-state lawyer to appear *pro hac vice* in an Ohio court does not fall among those interests protected by the Due Process Clause of the Fourteenth Amendment.  Because we agree with this contention, we grant the petition for certiorari and reverse the judgment of the Sixth Circuit.[1]

---

[1] Petitioners also contend that the injunction violates principles of abstention embodied in our decisions in *Younger* v. *Harris,* 401 U. S. 37 (1971); *Stefanelli* v. *Minard,* 342 U. S. 117 (1951); and *Douglas* v. *City of Jeannette,* 319 U. S. 157 (1943).  Because of our disposition of the merits of this case, we think it unnecessary to consider that issue.

Flynt and Hustler Magazine were indicted on February 8, 1977, for multiple violations of Ohio Rev. Code Ann. § 2907.31 (1975), which prohibits the dissemination of harmful material to minors. At the arraignment on February 25, local counsel for Flynt and Hustler presented an entry of counsel form that listed Fahringer and Cambria as counsel for both defendants. Neither lawyer was admitted to practice law in Ohio.[2] The form was the one used by members of the Ohio Bar, and it neither constituted an application for admission *pro hac vice* nor alerted the court that Fahringer and Cambria were not admitted to practice in Ohio. The judge presiding at the arraignment routinely endorsed the form but took no other action with respect to the two out-of-state lawyers.[3]

---

[2] The practice of law in Ohio is governed by Ohio Rev. Code Ann. § 4705.01 (1977), which provides in pertinent part:

"No person shall be permitted to practice as an attorney and counselor at law, or to commence, conduct, or defend any action or proceeding in which he is not a party concerned, either by using or subscribing his own name, or the name of another person, unless he has been admitted to the bar by order of the supreme court in compliance with its prescribed and published rules."

Rule I, § 8 (C), of the Supreme Court Rules for the Government of the Bar of Ohio determines when out-of-state attorneys may appear *pro hac vice* in Ohio courts:

"Admission Without Examination.

.        .        .        .        .

"(C) An applicant under this section shall not engage in the practice of law in this state prior to the filing of his application. To do so constitutes the unauthorized practice of law and will result in a denial of the application. This paragraph (C) does not apply to participation by a nonresident of Ohio in a cause being litigated in this state when such participation is with leave of the judge hearing such cause."

[3] The District Court found that Fahringer and Cambria had appeared on behalf of Flynt and Hustler Magazine in other criminal proceedings before the Hamilton County Court of Common Pleas, apparently without being required to do more than they did here. 434 F. Supp. 481, 483 (SD Ohio

The case was transferred as a matter of course to Judge Morrissey, who had before him another active indictment against Flynt and Hustler Magazine. Fahringer and Cambria made no application for admission *pro hac vice* to him or any other judge. At a pretrial conference on March 9 Judge Morrissey advised local counsel that neither out-of-state lawyer would be allowed to represent Flynt or Hustler Magazine. Fahringer and Cambria appeared in person before Judge Morrissey for the first time at a motions hearing on April 8, where they expressed their interest in representing the defendants. Judge Morrissey summarily dismissed the request. Respondents then commenced a mandamus action in the Ohio Supreme Court seeking to overturn the denial of admission. They also filed an affidavit of bias and prejudice seeking to remove Judge Morrissey from the case. The Ohio court dismissed the mandamus action but did remove Judge Morrissey, stating that while it found no evidence of bias or prejudice, trial before a different judge would avoid even the appearance of impropriety. The new trial judge ruled that the Ohio Supreme Court's dismissal of the mandamus action bound him to deny Fahringer and Cambria permission to represent Flynt and Hustler Magazine, but he did allow both of them to work with in-state counsel in preparing the case.

Respondents next filed this suit in the United States District Court for the Southern District of Ohio to enjoin further

1977). This prior experience might explain why the local lawyer did not alert the court that Fahringer and Cambria were not admitted to practice in Ohio, but it does not indicate that the first judge's endorsement of the entry form, without more, constituted leave for a *pro hac vice* appearance. Although the District Court found that the manner in which Fahringer and Cambria sought leave for an appearance comported with the "customary" procedures of the court, *ibid.*, it made no finding that these lawyers justifiably relied on any official explanation of these procedures or had any other ground for believing they actually had received leave of the court to appear.

prosecution of the criminal case until the state trial court held a hearing on the contested *pro hac vice* application. The court ruled that the lawyers' interest in representing Flynt and Hustler Magazine was a constitutionally protected property right which petitioners had infringed without according the lawyers procedural due process. 434 F. Supp. 481 (1977). Further prosecution of Flynt and Hustler Magazine therefore was enjoined until petitioners tendered Fahringer and Cambria the requested hearing. The Sixth Circuit affirmed, holding that the lawyers could not be denied the privilege of appearing *pro hac vice* "without a meaningful hearing, the application of a reasonably clear legal standard and the statement of a rational basis for exclusion." 574 F. 2d 874, 879 (1978).

As this Court has observed on numerous occasions, the Constitution does not create property interests. Rather it extends various procedural safeguards to certain interests "that stem from an independent source such as state law." *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972); see *Memphis Light, Gas & Water Div.* v. *Craft,* 436 U. S. 1, 9 (1978); *Bishop* v. *Wood,* 426 U. S. 341, 344 (1976); *Paul* v. *Davis,* 424 U. S. 693, 709–710 (1976); *Goss* v. *Lopez,* 419 U. S. 565, 572–574 (1975); *Perry* v. *Sindermann,* 408 U. S. 593, 602 n. 7 (1972). The Court of Appeals evidently believed that an out-of-state lawyer's interest in appearing *pro hac vice* in an Ohio court stems from some such independent source. It cited no state-law authority for this proposition, however, and indeed noted that "Ohio has no specific standards regarding *pro hac vice* admissions . . . ." 574 F. 2d, at 879. Rather the court referred to the prevalence of *pro hac vice* practice in American courts and instances in our history where counsel appearing *pro hac vice* have rendered distinguished service. We do not question that the practice of courts in most States is to allow an out-of-state lawyer the privilege of appearing upon motion, especially when he is associated with a member

of the local bar. In view of the high mobility of the bar, and also the trend toward specialization, perhaps this is a practice to be encouraged. But it is not a right granted either by statute or the Constitution. Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions. The States prescribe the qualifications for admission to practice and the standards of professional conduct. They also are responsible for the discipline of lawyers.[4]

A claim of entitlement under state law, to be enforceable, must be derived from statute or legal rule or through a mutually explicit understanding. See *Perry, supra,* at 601–602. The record here is devoid of any indication that an out-of-state lawyer may claim such an entitlement in Ohio,

---

[4] The dissenting opinion relies heavily on dictum in *Spanos* v. *Skouras Theatres Corp.,* 364 F. 2d 161 (CA2 1966). The facts of that case were different from those here, and the precise holding of the court was quite narrow. The court ruled that where a client sought to defend on the ground of illegality against an out-of-state attorney's action for his fee, and where the illegality stemmed entirely from the failure of the client's in-state attorneys to obtain leave for the out-of-state attorney to appear in Federal District Court, the client would not be allowed to escape from the contract through his own default. *Id.,* at 168–169. The balance of the opinion, which declared that "under the privileges and immunities clause of the Constitution no state can prohibit a citizen with a federal claim or defense from engaging an out-of-state lawyer to collaborate with an in-state lawyer and give legal advice concerning it within the state," *id.,* at 170, must be considered to have been limited, if not rejected entirely, by *Norfolk & Western R. Co.* v. *Beatty,* 423 U. S. 1009 (1975).

The dissenting opinion also suggests that a client's interest in having out-of-state counsel is implicated by this decision. *Post,* at 445–446, n. 2. The court below, however, "did not reach the issue of whether the constitutional rights of Flynt and Hustler Magazine had also been violated," 574 F. 2d 874, 877 (CA6 1978), recognizing as it did that a federal-court injunction enjoining a state criminal prosecution on a ground that could be asserted by the defendant in the state proceeding would conflict with this Court's holding in *Younger* v. *Harris,* 401 U. S. 37 (1971).

where the rules of the Ohio Supreme Court expressly consign the authority to approve a *pro hac vice* appearance to the discretion of the trial court. N. 2, *supra*. Even if, as the Court of Appeals believed, respondents Fahringer and Cambria had "reasonable expectations of professional service," 574 F. 2d, at 879, they have not shown the requisite *mutual* understanding that they would be permitted to represent their clients in any particular case in the Ohio courts. The speculative claim that Fahringer's and Cambria's reputation might suffer as the result of the denial of their asserted right cannot by itself make out an injury to a constitutionally protected interest. There simply was no deprivation here of some right previously held under state law. *Id.*, at 708–709.

Nor is there a basis for the argument that the interest in appearing *pro hac vice* has its source in federal law. See *Paul* v. *Davis, supra*, at 699–701. There is no right of federal origin that permits such lawyers to appear in state courts without meeting that State's bar admission requirements. This Court, on several occasions, has sustained state bar rules that excluded out-of-state counsel from practice altogether or on a case-by-case basis. See *Norfolk & Western R. Co.* v. *Beatty*, 423 U. S. 1009 (1975), summarily aff'g 400 F. Supp. 234 (SD Ill.); *Brown* v. *Supreme Court of Virginia*, 414 U. S. 1034 (1973), summarily aff'g 359 F. Supp. 549 (ED Va.). Cf. *Hicks* v. *Miranda*, 422 U. S. 332, 343–345 (1975). These decisions recognize that the Constitution does not require that because a lawyer has been admitted to the bar of one State, he or she must be allowed to practice in another. See *Ginsburg* v. *Kovrak*, 392 Pa. 143, 139 A. 2d 889, appeal dismissed for want of substantial federal question, 358 U. S. 52 (1958). Accordingly, because Fahringer and Cambria did not possess a cognizable property interest within the terms of the Fourteenth Amendment, the Constitution does not obligate the Ohio courts to accord them procedural due process in passing on their application for permission to

appear *pro hac vice* before the Court of Common Pleas of Hamilton County.[5]

The petition for writ of certiorari is granted, the judgment

---

[5] The dissenting opinion of MR. JUSTICE STEVENS argues that a lawyer's right to "pursu[e] his calling is protected by the Due Process Clause . . . when he crosses the border" of the State that licensed him, *post*, at 445. MR. JUSTICE STEVENS identifies two "protected" interests that "reinforce" each other. These are said to be "the 'nature' of the interest in *pro hac vice* admissions [and] the 'implicit promise' inhering in Ohio custom." *Post*, at 456.

The first of these lawyer's "interests" is described as that of "discharging [his] responsibility for the fair administration of justice in our adversary system." *Post*, at 453. As important as this interest is, the suggestion that the Constitution assures the right of a lawyer to practice in the court of every State is a novel one, not supported by any authority brought to our attention. Such an asserted right flies in the face of the traditional authority of state courts to control who may be admitted to practice before them. See *Norfolk & Western R. Co.* v. *Beatty, supra;* ABA Special Committee on Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement 13–14 (Final Draft 1970). If accepted, the constitutional rule advanced by the dissenting opinion would prevent those States that have chosen to bar all *pro hac vice* appearances from continuing to do so, see, *e. g.*, Cal. Bus. & Prof. Code Ann. §§ 6062, 6068 (West 1974 and Supp. 1978); and would undermine the policy of those States which do not extend reciprocity to out-of-state lawyers, see, *e. g.*, Ariz. Sup. Ct. Rule 28 (c) I; Fla. Rules of the Sup. Ct. Relating to Admissions to the Bar, Art. I, § 1.

The second ground for due process protection identified in the dissenting opinion is the "implicit promise" inherent in Ohio's past practice in "assur[ing] out-of-state practitioners that they are welcome in Ohio's courts. . . ." *Post*, at 456, 453. We recall no other claim that a constitutional right can be created—as if by estoppel—merely because a wholly and *expressly* discretionary state privilege has been granted generously in the past. That some courts, in setting the standards for admission *within their jurisdiction,* have required a showing of cause before denying leave to appear *pro hac vice* provides no support for the proposition that the Constitution imposes this "cause" requirement on state courts that have chosen to reject it.

of the Sixth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE would grant certiorari and set the case for oral argument.

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

A lawyer's interest in pursuing his calling is protected by the Due Process Clause of the Fourteenth Amendment.[1] The question presented by this case is whether a lawyer abandons that protection when he crosses the border of the State which issued his license to practice.

The Court holds that a lawyer has no constitutionally protected interest in his out-of-state practice. In its view, the interest of the lawyer is so trivial that a judge has no obligation to give any consideration whatsoever to the merits of a *pro hac vice* request, or to give the lawyer any opportunity to advance reasons in support of his application. The Court's square holding is that the Due Process Clause of the Fourteenth Amendment simply does not apply to this kind of ruling by a state trial judge.[2]

---

[1] *Konigsberg v. State Bar,* 353 U. S. 252; *Schware v. Board of Bar Examiners,* 353 U. S. 232, 238–239, and n. 5.

[2] Although the Court does not address it, this case also presents the question whether a defendant's interest in representation by nonresident counsel is entitled to any constitutional protection. The clients, as well as the lawyers, are parties to this litigation. Moreover, the Ohio trial judge made it perfectly clear that his ruling was directed at the defendants, and not merely their counsel. After striking the appearances of Fahringer and Cambria, the trial judge stated:

"I will tell you this then, Mr. Flynt. [T]he case is set for the 2d of May, 1977. . . . *The only thing is that you will be restricted to having an attorney that's admitted to practice in the State of Ohio.*" Tr. of

The premises for this holding can be briefly stated. A nonresident lawyer has no right, as a matter of either state or federal law, to appear in an Ohio court. Absent any such enforceable entitlement, based on an explicit rule or mutual understanding, the lawyer's interest in making a *pro hac vice* appearance is a mere "privilege" that Ohio may grant or withhold in the unrestrained discretion of individual judges. The conclusion that a lawyer has no constitutional protection against a capricious exclusion [3] seems so obvious to the major-

Proceedings in Common Pleas Court, Hamilton County, Ohio, in No. B77–0341 on Apr. 8, 1977, p. 5 (emphasis added).

A defendant's interest in adequate representation is "perhaps his most important privilege" protected by the Constitution. *Powell* v. *Alabama,* 287 U. S. 45, 70. Whatever the scope of a lawyer's interest in practicing in other States may be, Judge Friendly is surely correct in stating that the client's interest in representation by out-of-state counsel is entitled to some measure of constitutional protection:

"We are persuaded, however, that where a right has been conferred on citizens by federal law, the constitutional guarantee against its abridgment must be read to include what is necessary and appropriate for its assertion. In an age of increased specialization and high mobility of the bar, this must comprehend the right to bring to the assistance of an attorney admitted in the resident state a lawyer licensed by 'public act' of any other state who is thought best fitted for the task, and to allow him to serve in whatever manner is most effective, subject only to valid rules of courts as to practice before them. Cf. *Lefton* v. *City of Hattiesburg,* 333 F. 2d 280, 285 (5 Cir. 1964). Indeed, in instances where the federal claim or defense is unpopular, advice and assistance by an out-of-state lawyer may be the only means available for vindication." *Spanos* v. *Skouras Theatres Corp.,* 364 F. 2d 161, 170 (en banc) (CA2 1966).

[3] In this case there is no dispute about the capricious character of the Ohio court's action. Notwithstanding the unblemished professional careers of Fahringer and Cambria—in Ohio and elsewhere—their adherence to the same application procedures that they had followed successfully in the past, and their demonstrated familiarity with the issues involved in the litigation, Judge Morrissey refused to allow them to appear *pro hac vice.* In full, Judge Morrissey ruled: "Mr. Fahringer and Mr. Cambria are not attorneys of record in this case and will not be permitted to try this case." Tr. of Apr. 8, 1977, *supra,* at 3. So far as the record shows,

ity that argument of the question is unnecessary. Summary reversal is the order of the day.

A few years ago the Court repudiated a similar syllogism which had long supported the conclusion that a parolee has no constitutionally protected interest in his status.[4] Accepting

this was the second official action taken with respect to the *pro hac vice* applications of Fahringer and Cambria. In the first, Judge Rupert A. Doan, who presided at Flynt's arraignment, issued two orders designating both lawyers counsel "of record" in case No. B77–0341, the case eventually assigned to Judge Morrissey for trial. According to Rule 10 (E) of the Rules of Local Practice of the Court of Common Pleas, Hamilton County, Ohio, under which Judges Doan and Morrissey were operating, once a designation order is filed, "such attorney shall become attorney of record . . . and shall not be permitted to withdraw except upon written motion and for good cause shown." Despite Rule 10 (E), no objection to the appearance of Fahringer and Cambria, nor any argument either for or against their request, was heard in advance of the final ruling. In point of fact, nothing in the record identifies a legitimate reason for the judge's action.

The record does suggest, and in any case the Court's broad holding would certainly encompass, one explanation for Judge Morrissey's unusual ruling, but it can hardly be characterized as legitimate. This is an obscenity case. Conceivably Judge Morrissey has strong views about the distribution of pornographic materials to minors and about lawyers who specialize in defending such activity. Perhaps these are not the kind of lawyers that he wants practicing in his courtroom. That Judge Morrissey reportedly referred to Fahringer as a "fellow traveler" of pornographers is at least consistent with these speculations. Cincinnati Post, Feb. 9, 1977, p. 13. Indeed, after denying respondents' request to have Judge Morrissey removed from the case for bias, the Supreme Court of Ohio without explanation ordered that another judge of the Hamilton County Court of Common Pleas try the case.

[4] That syllogism had its adherents well into this century. See *Curtis* v. *Bennett*, 351 F. 2d 931, 933 (CA8 1965), quoted in *Morrissey* v. *Brewer*, 443 F. 2d 942, 946 (CA8 1971): "A parole is a matter of grace, not a vested right. . . . [D]iscretion is left to the States as to the manner and terms upon which paroles may be granted and revoked. Federal due process does not require that a parole revocation be predicated upon notice and opportunity to be heard." See also *Hyser* v. *Reed*, 115 U. S. App. D. C. 254, 266, 318 F. 2d 225, 237 (1963), cert. denied *sub nom. Jamison*

the premise that the parolee has no "right" to preserve his contingent liberty, the Court nevertheless concluded that the nature of his status, coupled with the State's "implicit promise" that it would not be revoked arbitrarily, was sufficient to require constitutional protection. *Morrissey* v. *Brewer,* 408 U. S. 471, 481–482.[5] As the Court observed, it "is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' " *Id.,* at 482. In my judgment, it is equally futile to try to deal with the problem presented by this case in terms of whether the out-of-state pursuit of a lawyer's calling is based on an "explicit," or an "enforceable" "entitlement" rather than a so-called "privilege." Instead, we should examine the nature of the activity and the implicit promise Ohio has made to these petitioners.

I

The notion that a state trial judge has arbitrary and unlimited power to refuse a nonresident lawyer permission to appear in his courtroom is nothing but a remnant of a bygone

---

v. *Chappell,* 375 U. S. 957 ("In a real sense the Parole Board in revoking parole occupies the role of parent withdrawing a privilege from an errant child not as punishment but for misuse of the privilege").

[5] "The question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment. . . .

"The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if his parole is revoked.

"We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal." 408 U. S., at 481–482.

era. Like the body of rules that once governed parole, the nature of law practice has undergone a metamorphosis during the past century. Work that was once the exclusive province of the lawyer is now performed by title companies, real estate brokers, corporate trust departments, and accountants. Rules of ethics that once insulated the local lawyer from competition are now forbidden by the Sherman Act[6] and by the First Amendment to the Constitution of the United States.[7] Interstate law practice and multistate law firms are now commonplace.[8] Federal questions regularly arise in state criminal trials and permeate the typical lawyer's practice. Because the assertion of federal claims or defenses is often unpopular,

[6] Because the "transactions which create the need for the particular legal services in question frequently are interstate transactions," the practice of law is now regarded as a commercial activity subject to the strictures of the Sherman Act. *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 783–784.

[7] Lawyers now have a constitutional right to advertise because "significant societal interests are served by such speech." *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 364.

[8] "Multistate or interstate practice by attorneys in this country is an expanding phenomenon. While no published quantitative data specifically support that assertion, a variety of established or verifiable facts exist that make the inference virtually indisputable. First is the increased mobility . . . of legal problem-solvers, problem-bringers and hence the legal problems themselves. Second, an outgrowth of the first set of facts is the increasing degree of uniformity of our laws, to a point where we are now commonly confronted with model codes, uniform state acts, federal practice rules (often copied by states) and similar substantive and procedural developments. Third, partly a response to the first two sets of facts and partly a reflection of the growing general complexity of our society, is the gradual change in the character of law practice from a generalist skill to an increasingly specialized one; hence the emergence of lawyers regarded and operating as . . . specialists . . . equipped to cope with problems that transcend jurisdictional boundaries and the legal competence of local generalists." Brakel & Loh, Regulating the Multistate Practice of Law, 50 Wash. L. Rev. 699, 699–700 (1975) (footnote omitted). See also 19 Stan. L. Rev. 856, 869 (1967).

"advice and assistance by an out-of-state lawyer may be the only means available for vindication." [9] The "increased specialization and high mobility" [10] of today's Bar is a consequence of the dramatic change in the demand for legal services that has occurred during the past century.

History attests to the importance of *pro hac vice* appearances. As Judge Merritt, writing for the Court of Appeals, explained:

"Nonresident lawyers have appeared in many of our most celebrated cases. For example, Andrew Hamilton, a leader of the Philadelphia bar, defended John Peter Zenger in New York in 1735 in colonial America's most famous freedom-of-speech case. Clarence Darrow appeared in many states to plead the cause of an unpopular client, including the famous *Scopes* trial in Tennessee where he opposed another well-known, out-of-state lawyer, William Jennings Bryan. Great lawyers from Alexander Hamilton and Daniel Webster to Charles Evans Hughes and John W. Davis were specially admitted for the trial of important cases in other states. A small group of lawyers appearing *pro hac vice* inspired and initiated the civil rights movement in its early stages. In a series of cases brought in courts throughout the South, out-of-state lawyers Thurgood Marshall, Constance Motley and Spottswood Robinson, before their appointments to the federal bench, developed the legal principles which gave rise to the civil rights movement.

"There are a number of reasons for this tradition. 'The demands of business and the mobility of our society' are the reasons given by the American Bar Association in Canon 3 of the Code of Professional Responsibility. That Canon discourages 'territorial limitations' on the

---

[9] *Spanos* v. *Skouras Theatres Corp.*, 364 F. 2d, at 170.
[10] *Ibid.*

practice of law, including trial practice. There are other reasons in addition to business reasons. A client may want a particular lawyer for a particular kind of case, and a lawyer may want to take the case because of the skill required. Often, as in the case of Andrew Hamilton, Darrow, Bryan .and Thurgood Marshall, a lawyer participates in a case out of a sense of justice. He may feel a sense of duty to defend an unpopular defendant and in this way to give expression to his own moral sense. These are important values, both for lawyers and clients, and should not be denied arbitrarily." 574 F. 2d 874, 878–879 (CA6 1978) (footnotes omitted).[11]

The modern examples identified by Judge Merritt, though more illustrious than the typical *pro hac vice* appearance, are not rare exceptions to a general custom of excluding nonresident lawyers from local practice. On the contrary, appearances by out-of-state counsel have been routine throughout the country for at least a quarter of a century.[12] The custom is so well recognized that, as Judge Friendly observed in 1966, there "is not the slightest reason to suppose" that a qualified lawyer's *pro hac vice* request will be denied.[13]

This case involves a *pro hac vice* application by qualified legal specialists; [14] no legitimate reason for denying their

[11] See also Judge Soper's discussion in *In re Ades*, 6 F. Supp. 467, 475–476 (Md. 1934).

[12] Brakel & Loh, *supra* n. 8, at 702, and n. 9; Note, Attorneys: Interstate and Federal Practice, 80 Harv. L. Rev. 1711, 1716 (1967).

[13] *Spanos* v. *Skouras Theatres Corp., supra,* at 168.

[14] Both Fahringer and Cambria are members of the Bar of New York, who specialize in criminal defense and obscenity law. In 1975, the former received the Outstanding Practitioner of the Year award from the New York State Bar Association. The latter received his legal education in Ohio at the University of Toledo Law School where he graduated first in his class. While in law school, he was admitted by the State of Ohio as a legal intern and practiced as such in the Municipal Prosecutor's office in Toledo.

request is suggested by the record.[15]   They had been retained to defend an unpopular litigant in a trial that might be affected by local prejudices and attitudes.[16]   It is the classic situation in which the interests of justice would be served by allowing the defendant to be represented by counsel of his choice.

The interest these lawyers seek to vindicate is not merely the pecuniary goal that motivates every individual's attempt to pursue his calling.[17]   It is the profession's interest in

---

[15] "No evidence of any disciplinary action against [Fahringer and Cambria] by any bar association has been presented to the Court, nor is there reason to believe that any such action is presently contemplated.   Both are competent, experienced and qualified in the representation of persons charged with crimes." 434 F. Supp. 481, 483 (SD Ohio 1977).

[16] Ohio charged that respondent Flynt's publication entitled "War, The Real Obscenity," is harmful to youth contrary to Ohio Rev. Code Ann. § 2907.31 (1975).   Among his defenses are several based on the Federal Constitution.   He claims that § 2907.31 is "void for vagueness and overbreadth, impos[es] an impermissible prior restraint on the publication and circulation of materials protected by the First and Fourteenth Amendments to the Constitution," and "bears no rational or reasonable relationship to a legitimate state interest."   Complaint for Preliminary and Permanent Injunction and Declaratory Judgment, in Civ. Act. No. C–1–77–319 (SD Ohio, June 14, 1977), pp. 19–21.

[17] In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Board of Regents* v. *Roth,* 408 U. S. 564, 572.   Although the boundaries of the "liberty" protected by the Fourteenth Amendment have never been conclusively surveyed, it is clear that they encompass "not merely [the] freedom from bodily restraint" and the rights conferred by specific provisions of the Constitution, *Meyer* v. *Nebraska,* 262 U. S. 390, 399, but also the " 'privileges long recognized at common law as essential to the orderly pursuit of happiness.' " *Ingraham* v. *Wright,* 430 U. S. 651, 673, quoting *Meyer* v. *Nebraska, supra,* at 399.   See *Smith* v. *Organization of Foster Families,* 431 U. S. 816, 845.   Among those privileges is "the right to hold specific private employment and to follow a chosen profession," *Greene* v. *McElroy,* 360 U. S. 474, 492, including "the practice of law." *Schware* v. *Board of Bar Examiners,* 353 U. S., at 238.

Fahringer and Cambria in no way rely on the fact that the denial of

discharging its responsibility for the fair administration of justice in our adversary system. The nature of that interest is surely worthy of the protection afforded by the Due Process Clause of the Fourteenth Amendment.

## II

In the past, Ohio has implicitly assured out-of-state practitioners that they are welcome in Ohio's courts unless there is a valid, articulable reason for excluding them. Although the Ohio Supreme Court dismissed respondents' petition for an extraordinary writ of mandamus in this case, it has not dispelled that assurance because it did not purport to pass on the merits of their claim.[18] In my opinion the State's assurance is adequate to create an interest that qualifies as "property" within the meaning of the Due Process Clause.

The District Court found as a fact that Ohio trial judges routinely permit out-of-state counsel to appear *pro hac vice*.[19] This regular practice is conducted pursuant to the Rules of the Supreme Court of Ohio,[20] Ohio's Code of Professional

---

their applications "might make them somewhat less attractive" to clients and might otherwise compromise their professional reputations. Cf. *Bishop* v. *Wood,* 426 U. S. 341, 348–350.

[18] The only record of the Ohio Supreme Court's actions in this case is a journal notation that it was "dismissed." The record indicates that petitioners argued to the Supreme Court in their written submissions that the court could not entertain an extraordinary writ in this matter but that respondents' remedy lay in a post-trial appeal—assuming Flynt was convicted. The newly assigned trial judge in Flynt's case, the only Ohio court of which we are aware that has interpreted the Ohio Supreme Court's actions in this matter, concluded that the dismissal was *not* on the merits of respondents' claim of a right to an explanation before being denied admission. It instead concluded that the claim "apparently is an issue that you will have to resolve in the normal appellate procedures if and when the opportunity presents itself." Tr. of May 10, 1977, p. 16.

[19] 434 F. Supp., at 483. See *State* v. *Ross,* 36 Ohio App. 2d 185, 188, 304 N. E. 2d 396, 399 (1973), cert. denied, 415 U. S. 904.

[20] Rule I, § 8 (C), of the Supreme Court of Ohio Rules for the Government of the Bar of Ohio allows "participation by a nonresident of Ohio

Responsibility,[21] rules of each local court,[22] and a leading opinion of the Ohio Court of Appeals identifying criteria that should inform a trial judge's discretion in acting on *pro hac vice* applications.[23] While it is unquestionably true that an Ohio trial judge has broad discretion in determining whether or not to allow nonresident lawyers to appear in his court, it is also true that the Ohio rules, precedents, and practice give out-of-state lawyers an unequivocal expectation that the exercise of that discretion will be based on permissible reasons.[24]

---

in a cause being litigated in this state when such participation is with leave of the judge hearing such cause."

[21] Canon 3 of Ohio's Code of Professional Responsibility recognizes the indispensability to many modern attorneys of the ability to pursue their clients' interests across state lines:

"[T]he legal profession should discourage regulation that unreasonably imposes territorial limitations upon the right of a lawyer to handle the legal affairs of his client or upon the opportunity of a client to obtain the services of a lawyer of his choice in all matters including the presentation of a contested matter in a tribunal before which the lawyer is not permanently admitted to practice."

[22] Rule 10(E) of the Rules of Local Practice of the Court of Common Pleas, Hamilton County, Ohio, requires "[a]ny attorney who accepts private employment in any criminal case" to file a specified form. Once that form is endorsed by a judge, as occurred here, the attorney becomes "attorney of record" who "shall not be permitted to withdraw except upon written motion and for good cause shown." See n. 3, *supra*.

[23] *State* v. *Ross, supra*.

[24] "It has, however, been generally recognized that an attorney not admitted to practice in Ohio, but in good standing in another state, may be specially admitted for the purpose of representing a person in a particular case, be it civil or criminal. Whether or not so to specially permit an attorney not admitted to practice in Ohio, but admitted to practice and in good standing in another state, to represent a party in a particular action, is a matter lying within the sound discretion of the trial court. Thus, we must determine whether there has been an abuse of discretion in this instance." *State* v. *Ross, supra*, at 188, 304 N. E. 2d, at 399.

Other appellate courts have held or stated in dicta that admission *pro hac vice* to trial courts within their jurisdiction may not be denied without

In *State* v. *Ross,* 36 Ohio App. 2d 185, 304 N. E. 2d 396 (1973), the leading Ohio case in this area, the Ohio Court of Appeals entertained an appeal from a trial judge's order denying an out-of-state attorney's *pro hac vice* application. The appellate court exhaustively inquired into the basis for the trial court's action and identified the specific misdeeds of the attorney that justified his exclusion, before concluding that the trial judge had acted properly.[25]   The only inference that can be drawn from that opinion is that an arbitrary ruling by the trial judge would have constituted reversible error; in this area of Ohio law, at least, the authority to exercise discretion does not include the power to act arbitrarily.[26]   Having made this implicit promise to respondent attorneys,[27] Ohio may not nullify the substance of that promise

cause. *In re Evans,* 524 F. 2d 1004, 1007 (CA5 1975) (denial inappropriate except upon showing of unethical conduct); *McKenzie* v. *Burris,* 255 Ark. 330, 344, 500 S. W. 2d 357, 366 (1973) (trial court may not impose "arbitrary numerical limitation on the number of [*pro hac vice*] appearances by an attorney" with ιexpertise in the relevant area). See also *Munoz* v. *United States District Court,* 446 F. 2d 434 (CA9 1971); *Atchison, T. & S. F. R. Co.* v. *Jackson,* 235 F. 2d 390, 393 (CA10 1956); *Brown* v. *Wood,* 257 Ark. 252, 258, 516 S. W. 2d 98, 102 (1974). The requirement of· cause has even greater support where, as here, see n. 3, *supra,* an out-of-state attorney in a criminal case has previously been made counsel of record by order of a trial court. *Cooper* v. *Hutchinson,* 184 F. 2d 119, 123 (CA3 1950); *State* v. *Kavanaugh,* 52 N. J. 7, 18, 243 A. 2d 225, 231 (1968); *Smith* v. *Brock,* 532 P. 2d 843, 850 (Okla. 1975).

[25] 36 Ohio App. 2d, at 190–201, 304 N. E. 2d, at 401–406.

[26] This "holding as a matter of state law" that out-of-state lawyers are entitled to have a trial judge exercise his discretion—that is to say, to have a permissible reason for his ruling—before he denies an application to appear, "necessarily establishes that [Fahringer and Cambria had a] property interest" protected by the Fourteenth Amendment.   See *Bishop* v. *Wood,* 426 U. S., at 345 n. 8.

[27] "Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."   *Board of*

by providing no procedures to safeguard its meaning. A state requirement that a judge's action in a contested matter be predicated on a permissible reason inevitably gives rise to a procedural requirement that the affected litigants have some opportunity to reason with the judge. See *Arnett* v. *Kennedy*, 416 U. S. 134, 167 (POWELL, J., concurring in part).[28]

### III

Either the "nature" of the interest in *pro hac vice* admissions or the "implicit promise" inhering in Ohio custom with respect to those admissions is sufficient to create an interest protected by the Due Process Clause. Moreover, each of these conclusions reinforces the other.

The mode of analysis employed by the Court in recent years has treated the Fourteenth Amendment concepts of "liberty" and "property" as though they defined mutually exclusive, and closed categories of interests, with neither shedding any light on the meaning of the other. Indeed, in some of the Court's recent opinions it has implied that not only property but liberty itself does not exist apart from specific state authorization or an express guarantee in the Bill of Rights.[29]

---

*Regents* v. *Roth*, 408 U. S., at 577. In this case, the state action that lies at the source of the relevant "understanding" or implied promise is multifaceted. In addition to the consistent past practice of Ohio trial judges, which is analogous to the course of administrative conduct found sufficient in *Morrissey*, that promise is supported by state and local rules and case law.

[28] "[T]he right to procedural due process . . . is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in federal employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards. As our cases have consistently recognized, the adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms." *Arnett*, 416 U. S., at 167 (POWELL, J., concurring in part) (footnote omitted).

[29] See *Paul* v. *Davis*, 424 U. S. 693; *Meachum* v. *Fano*, 427 U. S. 215. I continue to adhere to the view that "neither the Bill of Rights nor the

In my judgment this is not the way the majestic language of the Fourteenth Amendment should be read.

As is demonstrated by cases like *Meyer* v. *Nebraska,* 262 U. S. 390, 399; *Morrissey* v. *Brewer,* 408 U. S. 471; *Bell* v. *Burson,* 402 U. S. 535, 539, and Mr. Justice Frankfurter's classic concurring opinion in *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 162, judicial construction of the words "life, liberty, or property" is not simply a matter of applying the precepts of logic to accepted premises. Rather, it is experience and judgment that have breathed life into the Court's process of constitutional adjudication. It is not only Ohio's experience with out-of-state practitioners, but that of the entire Nation as well, that compels the judgment that no State may arbitrarily reject a lawyer's legitimate attempt to pursue this aspect of his calling.

## IV

It is ironic that this litigation should end as it began—with a judicial ruling on the merits before the parties have been heard on the merits. Pursuant to Rules 19, 23, and 24 of this Court, the only issue discussed in the petition for certiorari and in respondents' brief memorandum in reply is whether "a Writ of Certiorari should issue to review the judgment and opinion of the Sixth Circuit in this matter." Pet. for Cert. 19. This surely is not a case that should be decided before respondents have been given an opportunity to address the merits. Summary reversal "should be reserved for palpably clear cases of . . . error." *Eaton* v. *Tulsa,* 415 U. S. 697, 707

---

laws of sovereign States create the liberty which the Due Process Clause protects. The relevant constitutional provisions are limitations on the power of the sovereign to infringe on the liberty of the citizen. The relevant state laws either create property rights, or they curtail the freedom of the citizen who must live in an ordered society. Of course, law is essential to the exercise and enjoyment of individual liberty in a complex society. But it is not the source of liberty, and surely not the exclusive source." *Id.,* at 230 (STEVENS, J., dissenting).

(REHNQUIST, J., dissenting). Such reversals are egregiously improvident when the Court is facing a "novel constitutional question." *Pennsylvania* v. *Mimms,* 434 U. S. 106, 124 (STEVENS, J., dissenting).[30] Accordingly, I respectfully dissent from the Court's summary disposition of a question of great importance to the administration of justice.

---

[30] Although the Court cites three previous summary dispositions by this Court in favor of its decision, two have nothing whatsoever to do with *pro hac vice* admissions. Both are concerned with rules preventing out-of-state lawyers from setting up *permanent* practices in States where they were not licensed. *Brown* v. *Supreme Court of Virginia,* 414 U. S. 1034, summarily aff'g 359 F. Supp. 549 (ED Va. 1973); *Kovrak* v. *Ginsburg,* 358 U. S. 52, dismissing, for want of substantial federal question, appeal from 392 Pa. 143, 139 A. 2d 889 (1958). The third case involved a challenge on *substantive* due process grounds to a rule of the Supreme Court of Illinois that placed decisions on *pro hac vice* applications in the trial court's discretion. *Norfolk & Western R. Co.* v. *Beatty,* 423 U. S. 1009, summarily aff'g 400 F. Supp. 234 (SD Ill. 1975). So far as the opinion in the District Court in that case indicates, however, there was no claim that the rule had been applied arbitrarily or discriminatorily.