**Gilbert P. JOHNSON and Hervey M. Johnson**

v.

**Samuel J. TRUEBLOOD, Arnold E. Trueblood and Penn Eastern Development Company and Harvey Salwen.**

**Civ. A. No. 76–1002.**

United States District Court, E. D. Pennsylvania.

July 19, 1979.

Myron M. Cherry, Cherry, Flynn & Kanter, Chicago, Ill., Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiff.

Steven M. Angstreich, Philadelphia, Pa., for A. E. Trueblood and S. J. Trueblood.

Richard M. Squire, Philadelphia, Pa., for Salwen.

1. The trial itself, limited to liability issues, proceeded for seventy days. The jury took approximately two full days to deliberate before reaching a verdict.

2. This case is a derivative shareholder action brought by plaintiff-shareholders Gilbert and Hervey Johnson against three directors of the Board of Penn Eastern Corporation: Arnold Trueblood, Samuel Trueblood, and Harvey Salwen. Six counts of the Complaint were submitted to the jury for deliberation; five of those counts were claims brought under Delaware

## MEMORANDUM AND ORDER

HUYETT, District Judge.

On July 3, 1979, on the seventy-second day of trial,[1] a jury returned a verdict in favor of all defendants on all remaining counts in the above-captioned case.[2] During those seventy-two days of trial, I was witness to certain conduct by plaintiffs' attorney, Myron M. Cherry, Esquire, who maintains an office for the regular practice of law in Chicago, Illinois. The conduct of Mr. Cherry during trial was outrageous, unprofessional, and an affront to the dignity of orderly courtroom proceedings. Mr. Cherry was granted permission to appear and conduct the trial of the instant case on behalf of plaintiffs pro hac vice pursuant to Local Rule of Civil Procedure 10(b) at the time the suit was instituted in early 1976. In light of Mr. Cherry's conduct throughout the trial, I now revoke that grant of permission to appear pro hac vice and order that Mr. Cherry cease from active participation in the conduct of this action before this Court, effective as of the close of trial itself.[3] I do not take this action lightly, but after careful, considered reflection.

■ My power to revoke a pro hac vice appearance at the close of trial is clear, especially in circumstances where the conduct of counsel has, as in this case, exceeded the bounds of proper conduct set by the Code of Professional Responsibility [the "Code"]. Local Rule 9(a) limits the admission to the Bar of this Court to attorneys admitted to practice in the Supreme Court of the United States or the Supreme Court of Pennsylvania and who maintain an office in the Commonwealth of Pennsylvania for the regular practice of law. Mr. Cherry is

corporate law and the remaining count was a claim brought under Section 10–b of the Securities Exchange Act of 1934. Both plaintiffs are attorneys; one of the defendants, Samuel Trueblood, is also an attorney. This case was, essentially, a battle among attorneys in a business dispute.

3. This Order of revocation is effective *nunc pro tunc* as of July 3, 1979, the date the jury returned the verdict.

not admitted to the Bar of the Eastern District of Pennsylvania, and does not maintain an office in Pennsylvania for the regular practice of law. An attorney not admitted to the Bar of this Court may not conduct the trial of an action in this district without the permission of the Court. Local Rule of Civil Procedure 9(a) and 10(b). Permission to proceed pro hac vice [4] is not a right, but rather it is a privilege granted by courtesy and grace. *See, e. g., In Re Belli,* 371 F.Supp. 111 (D.D.C.1974); *Thomas v. Cassidy,* 249 F.2d 91 (4th Cir. 1957); *Atchison, T. & S. F. R. R. Co. v. Jackson,* 235 F.2d 390 (10th Cir. 1956). *Cf. Leis v. Flynt,* 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979) (the right of an out-of-state attorney to appear pro hac vice does not fall among those interests protected by the United States Constitution). In *Thomas v. Cassidy,* the Court of Appeals for the Fourth Circuit stated succinctly:

> It is well settled that permission to a nonresident attorney, who has not been admitted to practice in a court, to appear pro hac vice in a case there pending is not a right but a privilege, the granting of which is a matter of grace resting in the sound discretion of the presiding judge.

249 F.2d at 92.

This case differs somewhat from *Thomas, supra,* and *Jackson, supra,* in that Mr. Cherry was previously granted permission to proceed pro hac vice, and I now revoke that permission. These facts more closely resemble those in *In Re Belli, supra,* where an out-of-state attorney was initially permitted to proceed pro hac vice in the trial of an action. Following the completion of trial, the grant of a new trial, and the reassignment of the case to another judge of that same district, counsel renewed his motion to proceed pro hac vice. The trial judge denied the motion based upon false public statements made by counsel concerning the judiciary in that district, which the court believed were made recklessly and in violation of the Code. *Id.* at 114 and n. 8.

Similarly, I believe that I have the power, mea sponte, to revoke my grant of permission to proceed pro hac vice, where the actions of counsel disrupt the proper functioning of the Court and violate the Code.[5] While it may well be true that permission to proceed pro hac vice, once granted, may not be revoked absent a showing of "cause," *Cooper v. Hutchinson,* 184 F.2d 119 (3d Cir. 1950); *but see Leis v. Flynt, supra,* the trial court judge of necessity retains the inherent power to revoke that permission where the attorney behaves in a disruptive and unprofessional manner. *Cf. Atchison, T. & S. F. R. R. Co. v. Jackson, supra* at 393. This power flows inexorably from the trial judge's obligation to ensure a dignified and orderly trial and to protect and further the untrammeled administration of justice.

I would further note that, faced with unprofessional conduct by an attorney who is not a member of the Bar of this Court, a trial judge has few alternatives. An attorney who appears pro hac vice is not subject to disciplinary proceedings before the Board of Censors of this Court, since the jurisdiction of that body is limited to "members of the Bar of this Court." Local Rule of Civil Procedure 13(c). *Cf. Leis v. Flynt, supra.* Furthermore, an attorney appearing pro hac vice, who does not regularly appear before a tribunal, is not subject to the stricture which most commonly restrains unprofessional conduct in the courtroom: the desire not to antagonize a judge where it is likely that one will have another case be-

---

4. The term "pro hac vice" literally means "for this turn" or "for this particular occasion." Black's Law Dictionary 1363 (rev. 4th ed. 1968).

5. No hearing was held on this matter, for two primary reasons. First, I do not believe that Mr. Cherry has any due process right to a hearing, in light of the Supreme Court's decision in *Leis v. Flynt, supra.* I could find no authority in this district which would lead me to believe that counsel has any "property right" to proceed pro hac vice before this Court. Second, I conclude that a hearing could serve no fact-finding purpose, since all of the matters I discuss in this memorandum concern conduct committed in the actual presence of the Court which I personally observed. *Cf.* Fed.R.Crim.P. 42(a).

fore that judge in the future. Absent these restraints on pro hac vice counsel, the trial judge who is faced with unprofessional conduct has little choice but to revoke permission to proceed pro hac vice from an out-of-state attorney who abuses the privilege he has been granted.

I conclude that I am here faced with conduct of counsel which was disruptive and unprofessional. In light of the foregoing, I will now describe certain actions and events which form the basis of my conclusion.

## I.

■ I start with the general observation that, in order for the judicial process to function properly, several predicates are essential. There must be courtesy and respect among counsel; for although counsel must be zealous in representing their clients, it is absolutely critical that the representations of counsel be accurate and trustworthy, and that counsel be willing and able to reach agreement on the myriad of nonessential matters arising during a trial without necessity of recourse to the trial judge. There must be good faith adherence to the rules of evidence and procedure. There must be an absence of "dirty tricks" and tactics designed solely for harassment. Most important, there must be order, rationality, and respect for judicial rulings. "Trial judges in court, like umpires at home plate, cannot always be right, but rulings they must make." *Commonwealth of Pennsylvania v. Local 542, International Union of Operating Engineers,* 73 F.R.D. 544, 546 (E.D.Pa.1976). Our system is built upon the assumption that these rulings will be respected, and that counsel will adhere to the limits set by the judge, resorting to the orderly process of appeal if counsel believes the rulings to be in error. Otherwise, the trial process disintegrates into anarchy and trial by ordeal. In the words of Chief Justice Burger,

Ethics and deportment, manners in the courtroom, where it is so visible, are not merely matters of protocol. Those are the lubricants which keep our adversary system from becoming a barroom brawl.

Remarks by the Honorable Warren E. Burger to the Judicial Conference of the District of Columbia Circuit (May 22, 1978), *reprinted at* 81 F.R.D. 272, 274.

In this case, those essential predicates were lacking. At the outset of trial, counsel for plaintiffs, Mr. Cherry, estimated that the liability portion of the trial would last approximately four weeks, or twenty trial days. In fact, the first witness, plaintiff Gilbert Johnson, was on the witness stand for twenty-two days, while the entire liability phase of the trial consumed seventy-two days. Even allowing for the well-known propensity of lawyers to underestimate the time necessary to try a case, the gross disparity between the estimate and the reality in this case compels the conclusion that something was amiss.

■ It is my belief that, in this case, the outrageous, unprofessional conduct of Mr. Cherry impeded the proper functioning of the judicial process. Mr. Cherry's actions transformed the trial into a nightmare of delay. At this juncture, I will describe several ways in which I believe Mr. Cherry's conduct was unprofessional and state illustrative examples of his conduct in support of my belief.

## II.

The following discussion, structured around the Code of Professional Responsibility, focuses upon the Ethical Considerations (EC's) [6] and Disciplinary Rules (DR's) [7] falling within the ambit of Canon 7, entitled "A Lawyer Should Represent a Client Zealously Within the Bounds of the Law."

---

**6.** "The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive." ABA Code of Professional Responsibility, Preamble and Preliminary Statement.

**7.** "The Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." *Id.*

DR 7–106 deals with Trial Conduct.[8] One of the basic mandates of this Disciplinary Rule is that counsel obey standing rules of the trial court or rulings made during the course of the proceedings. DR 7–106(A). While counsel may test the validity of such rulings, he must do so in good faith through appropriate procedures. *Id.* Additionally, counsel may not consciously or habitually violate established rules of evidence and procedure. DR 7–106(C)(7). Counsel should also be diligent in his efforts to guard against unintentional violation of these established rules. EC 7–25. These statements in the Code not only express the professional responsibilities of an attorney, but also prescribe the basic, essential rules necessary for the efficient trial of cases.

Mr. Cherry during the trial violated both the letter and spirit of existing rulings of this Court on many occasions.[9] For example, during opening argument to the jury, he discussed matters occurring after the filing of the complaint, matters which I had previously ruled were inadmissible during the liability phase of the trial.[10] Transcript at 2–61 through 2–62. By referring to these matters, he not only violated what I believe to have been a clear ruling of the Court, but also may have violated DR 7–106(C)(1), which forbids the allusion to any matters which will not be supported by relevant, admissible evidence.

On March 29, 1979, in discussions outside the presence of the jury, Mr. Cherry sought to have a certain document introduced into evidence. I declined to rule on the admissibility of the document in advance of its actual use during examination, but rather to defer my ruling until a foundation were laid so that it would be possible to see if the document could properly be used. Because of the critical character of the document, I specifically instructed Mr. Cherry on two occasions to advise counsel and the Court at

---

8. DR 7–106 states in full:
DR 7–106 Trial Conduct.
(A) A lawyer shall not disregard or advise his client to disregard a standing rule of a tribunal or a ruling of a tribunal made in the course of a proceeding, but he may take appropriate steps in good faith to test the validity of such rule or ruling.
(B) In presenting a matter to a tribunal, a lawyer shall disclose:
(1) Legal authority in the controlling jurisdiction known to him to be directly adverse to the position of his client and which is not disclosed by opposing counsel.
(2) Unless privileged or irrelevant, the identities of the clients he represents and of the persons who employed him.
(C) In appearing in his professional capacity before a tribunal, a lawyer shall not:
(1) State or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence.
(2) Ask any question that he has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person.
(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.
(4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein.
(5) Fail to comply with known local customs of courtesy or practice of the bar or a particular tribunal without giving to opposing counsel timely notice of his intent not to comply.
(6) Engage in undignified or discourteous conduct which is degrading to a tribunal.
(7) Intentionally or habitually violate any established rule of procedure or of evidence.
*Id.*

9. Unfortunately, only a partial transcript of trial is presently available. Approximately 3,400 pages are currently transcribed; the court reporter estimates that approximately 7,000 additional pages remain to be transcribed. Therefore, while I have made appropriate references to the transcript when possible, I have been forced to rely upon my contemporaneous notes in many instances.

10. Specifically, I had stated in conference immediately prior to opening argument that I considered matters occurring after the filing of the complaint to be irrelevant to the issues arising in the liability phase of the trial. I reserved for ruling during the trial itself the admissibility of certain of these events to show a "pattern or practice" on the part of the defendants. The matters alluded to during plaintiffs' opening argument however, had no connection with any "pattern or practice."

the time that he intended to use the document so that we could then go to sidebar and, out of the presence of the jury, consider whether the document was admissible. Transcript at 21–31 and 21–36. Notwithstanding this explicit instruction, Mr. Cherry proceeded to ask the witness a question based upon that document. At that point I sustained an objection to the question; nonetheless, Mr. Cherry proceeded to attempt to ask his question. Transcript at 21–46. I consider these acts to constitute disregard for my clear instruction to counsel.

Another example of counsel's violation of a court order occurred on April 4, 1979, during the cross-examination of Mrs. Webber, one of plaintiffs' expert witnesses. I had issued a standing rule that counsel for all parties were prohibited from speaking to their witnesses concerning matters arising during the cross-examination, while those witnesses were under cross-examination. At one point it was necessary to rule on a matter involving Mrs. Webber's testimony outside of her presence, and she was asked to leave the courtroom. During a recess, immediately after I had made my ruling, one of defendants' lawyers, Mr. Krimsky, overheard Mr. Cherry speaking with Mrs. Webber concerning my ruling. Mr. Cherry did not deny that this conversation took place; rather, he cavalierly asserted that no harm was caused by this conversation. Mr. Cherry misses the point. A court ruling cannot be disobeyed at will merely because a particular attorney believes that no harm will result. I therefore consider Mr. Cherry's actions in this instance to constitute willful disregard for a standing court order.

One final example may illustrate what I believe to be an egregious abuse of the judicial process. During the first several weeks of the trial, Mr. Cherry consistently made numerous motions to reconsider matters concerning rulings which I had carefully made. In most cases, there were no changes in circumstances which might have prompted me to change my ruling. While a motion for reconsideration is ordinarily not objectionable, Mr. Cherry made use of these motions to such an extreme degree that his conduct can only be characterized as abusive and harassing. In the absence of any reasonable grounds to believe that the judge has overlooked important factors in reaching his decision, motions to reconsider matters already considered and ruled upon are simply a tactic of delay. Repeated reargument of the same matter, *ad nauseum,* cannot be permitted if the trial process itself is to proceed in an expeditious and fair manner.[11]

I furthermore do not consider these numerous "motions" to be "appropriate steps in *good faith* to test the validity" of my rulings, as required by DR 7–106. The Supreme Court has stated:

[I]t is the right of counsel for every litigant to press his claim, even if it appears farfetched and untenable, to obtain the court's considered ruling. . . . But if the ruling is adverse, it is not counsel's right to resist or to insult the judge—his right is only respectfully to reserve his point for appeal. During a trial, lawyers must speak, each in his own time and within his allowed time, and with relevance and moderation.

*Sacher v. United States,* 343 U.S. 1, 9, 72 S.Ct. 451, 455, 96 L.Ed. 717 (1952). *Accord Maness v. Meyers,* 419 U.S. 449, 459, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975).

As a result of the actions of Mr. Cherry in this and other respects, I was forced to rule on March 9, 1979, that no further "motions for reconsideration" could be made. Notwithstanding this ruling, Mr. Cherry on several subsequent occasions made such motions.[12] The contumacious behavior of Mr.

11. In a related context, Judge Higginbotham aptly stated, "To grant [counsel] the latitude he seeks, one might as well have counsel wear the robes, ascend the bench and then make irrevocable rulings while the trial judge patiently awaits the command of counsel. A trial is not a process in anarchy to be engineered by trial counsel . . ." *Commonwealth of Pa. v. Local 542, Int'l Union of Operating Eng'rs, supra.*

12. Motions for reconsideration of the court's rulings were made even on the final day of trial, when Mr. Cherry made several motions to

Cherry in this and other respects needlessly prolonged the trial.

Another Disciplinary Rule, DR 7–106(C)(4) prohibits an attorney from "Assert[ing] his personal opinion as to the justness of a cause, as to the credibility of a witness, [or] as to the culpability of a civil litigant." During his closing argument, Mr. Cherry expressed his personal opinion and belief with respect to the evidence on more than one occasion. He also made veiled accusations to the effect that certain evidence presented by the defendants was "contrived". These comments by counsel were entirely improper and unprofessional.

There are other Disciplinary Rules which govern different aspects of trial conduct. DR 7–106(C)(6) prohibits "undignified or discourteous conduct which is degrading to a tribunal." Many types of conduct are encompassed within the proscription of this Rule. For example, EC 7–36 exhorts counsel on the one hand to be "respectful, courteous, and above-board in his relations with a judge," and on the other hand to avoid "undue solicitude for the comfort or convenience of judge or jury . . . and other conduct calculated to gain special consideration." EC 7–36. These rules also govern counsel's dealings with opposing counsel. Especially pertinent to the facts of this case is EC 7–37:

> In adversary proceedings, clients are litigants and though ill feeling may exist between clients, such ill feeling should not influence a lawyer in his conduct, attitude, and demeanor towards opposing lawyers. A lawyer should not make unfair or derogatory personal reference to opposing counsel. Haranguing and offensive tactics by lawyers interfere with the orderly administration of justice and have no proper place in our legal system.

*Id.* Hence, the Disciplinary Rule which proscribes "undignified conduct" governs counsel's dealings with the trial judge, jury, and opposing counsel.[13]

Mr. Cherry's actions directly contravened the mandates of DR 7–106(C)(6) in various ways throughout the trial. For example, it is the universal custom for counsel to stand respectfully and quietly at the time the judge enters the courtroom. This is a gesture of respect not only for the judge personally, but, more importantly, for the dignity of the court and the judicial process itself. On many occasions, at the time of my entry into the courtroom, Mr. Cherry, in a half-standing position, continued to make notes, or shuffle papers, or engage in conversation with plaintiffs or with plaintiffs' paralegal. Since this conduct continued after I had brought the matter to Mr. Cherry's attention, I can only conclude that his conduct exhibited willful and intentional disrespect for this Court.

On the other hand, Mr. Cherry's conduct exhibited unprofessional solicitude for the jurors' welfare. For example, on one Friday afternoon, after the jury had been dismissed and as they were leaving the courtroom, Mr. Cherry smiled, waved, and told the jury to "have a nice weekend." This remark constituted an unprofessional, patronizing comment intended to "gain special consideration" by the jury.[14] On another occasion, I informed counsel out of the presence of the jury that one juror had a transportation problem which made it important for court to recess at 4:00 or 4:15 P.M. every day. Later, while the jury was present, Mr. Cherry mentioned the juror's transportation problem and asked if I intended to recess at 4:00 P.M. to accommodate this juror. I considered these comments to be highly unprofessional and patronizing to the jury.

Mr. Cherry's actions towards opposing counsel were unprofessional in numerous respects. For example, Mr. Cherry made

---

reconsider my rulings concerning the length and order of the closing arguments to the jury.

**13.** Throughout the trial, I reiterated my desire to conduct a fair, quiet, and dignified trial, and asked counsel's assistance in this regard.

**14.** These and other lapses by Mr. Cherry cannot, unfortunately, be attributed to inexperience. Mr. Cherry represented to this Court that he is an experienced trial lawyer of almost twenty years experience who has tried many jury trials to completion.

persistent objections and interruptions during Mr. Krimsky's examination of several witnesses, in what I believe to be a willful attempt to harass and intimidate Mr. Krimsky and the witness. While such tactics are normally regarded as "fair game," Mr. Cherry's behavior in my view far exceeded the limits of fairness and propriety. For example, during one brief segment of Wayne Snyder's direct testimony lasting ninety-one minutes, Mr. Cherry made at least fifty-three interruptions in the form of objections, requests for instructions to the jury, and other matters. Many of the interruptions involved frivolous matters. I conclude, therefore, that the offensive tactics used by Mr. Cherry were employed willfully, with the intent to harass.

Mr. Cherry was rude and at times abusive toward opposing counsel. For example, on March 15, 1979, Mr. Cherry stated twice in open court that he would consider reporting Mr. Krimsky to the Bar Association for misrepresenting a factual matter.[15] On March 26, 1979, Mr. Cherry accused another counsel of "getting away with murder." Transcript at 18–125. On another occasion, in the presence of the jury, Mr. Cherry accused defense counsel of "misleading the jury."[16] Transcript at 20–46. These kinds of intemperate, undignified comments have no place in the courtroom. Finally, Mr. Cherry exhibited a total inability to reach agreement with opposing counsel on even the most minor of matters. The record is replete with instances where counsel were unable to agree upon matters such as the use to be made of exhibits, trial schedule, and the like.

Perhaps one of the reasons that the parties were not able to reach agreement on many matters is that Mr. Cherry's statements were often lacking in candor and accuracy. It was, therefore, difficult to have any confidence that one could rely

upon the statements made by Mr. Cherry. One example might suffice. During the argument on the Rule 50 motion made at the conclusion of plaintiffs' case, Mr. Cherry at several points made a representation to the court that document No. 74, entitled "Memorandum of Understanding," contained language providing for the "orderly repayment" of a certain loan, with the exact language being very significant. He made this assertion after defense counsel stated that the term "orderly repayment" appeared only in a related document, an Agreement dated April 18, 1973. In fact, Exhibit No. 74 nowhere contains the term "orderly repayment." I cannot say whether this misstatement of fact was intentional, and therefore a violation of DR 7–102(A)(5), or inadvertent. Nonetheless, the cumulative effect of this and other similar misstatements created an atmosphere of distrust and hostility among counsel.

One final example of Mr. Cherry's discourteous and undignified conduct occurred during opening arguments. I had asked counsel how much time they would need for opening speeches and then had imposed time limits accordingly. Mr. Krimsky was allotted thirty minutes. After Mr. Krimsky had been speaking for precisely eighteen minutes, Mr. Cherry, in full view of the jury, approached the Bench and passed a note to my law clerk which stated "Thirty minutes have expired." Shortly thereafter, Mr. Cherry interrupted Mr. Krimsky's opening remarks to state that he had exceeded his time limit. Because I had been keeping careful record of the time expired, I knew that this was not the case. These actions on the part of Mr. Cherry were, at the least, rude and impertinent. At most, they were a deliberate attempt to harass and distract Mr. Krimsky and prejudice the jury.

In sum, in view of the above matters and other occurrences which are too numerous

**15.** In fact, the representation made by Mr. Krimsky was substantially borne out by later testimony elicited from plaintiffs' own witnesses.

**16.** The cold record does not adequately capture the nature of many of these events as they

*actually occurred.* No bare transcript can adequately convey Mr. Cherry's tone of voice, his veiled sarcasm; nor can facial expressions and gestures be preserved. At the time these events occurred, however, they appeared to me to be particularly disturbing.

to recount, I conclude that Mr. Cherry's conduct throughout the trial was unprofessional in that he violated both the letter and the spirit of the Code of Professional Ethics.

### III.

In view of the above conclusion, I believe that it is within my discretion to revoke Mr. Cherry's permission to appear pro hac vice. This discretionary power, as I have stated previously, flows from the trial judge's inherent power to ensure a fair, dignified, orderly trial. Mr. Cherry's conduct in this case was unprofessional and disruptive to the orderly functioning of the trial process. Therefore, in the exercise of my discretion, I hereby revoke the permission of Myron M. Cherry, Esquire to appear before this court pro hac vice in this case.