SERVIDONE CONSTRUCTION CORPORATION, Plaintiff,

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY and First Bank National Association, Defendants/Counterclaimants,

v.

Joseph A. SERVIDONE, Victoria Servidone, Goddard & Blum, and Ray Goddard, Additional Defendants on the Counterclaims.

SERVIDONE CONSTRUCTION CORPORATION, Plaintiff,

v.

William BARR, Attorney General of the United States and Charles Bowsher, Comptroller General of the United States, Defendants,

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY and First Bank National Association, Intervenors,

v.

Max E. GREENBERG, Cantor, Trager & Toplitz and Naomi Reiss, Additional Defendants on the Cross–Claim.

SERVIDONE CONSTRUCTION CORPORATION, Petitioner,

v.

GODDARD & BLUM, a law partnership; Ray Goddard; and St. Paul Fire & Marine Insurance Company, Respondents.

and

GODDARD & BLUM, Ray Goddard, Gregory Ronan and Howard Blum, Cross-claimants,

v.

Naomi REISS, Additional Defendant on the Cross–Claims.

and

Howard BLUM, Barry Golomb, and The Minority Interest of Goddard & Blum, Cross-claimants,

v.

Gregory RONAN, Ray Goddard, and The Majority Interest of Goddard & Blum, Cross-claimants.

Nos. 91–CV–943, 91–CV–1170.

United States District Court, N.D. New York.

Dec. 11, 1995.

Orseck Law Offices (Gerald Orseck, of counsel), Liberty, New York, for Servidone Const. Corp.

MacKenzie, Smith, Lewis, Michell & Hughes (Nancy L. Pontius, Carter H. Strickland, of counsel), Syracuse, New York, Fabyanske, Svoboda, Westra, Davis & Hart (Gregory T. Spalj, of counsel), Minneapolis, Minnesota, for St. Paul Fire & Marine Ins. Co. and First Bank Nat. Ass'n.

De Luca & Forster (Thomas G. De Luca, of counsel), White Plains, New York, for St. Paul Fire & Marine Ins. Co.

Goddard, Ronan & Dineen (Joseph Dineen, of counsel), New York City, for the Majority Interest of Goddard & Blum, Ray Goddard, and Gregory Ronan.

Stewart A. Jackson, New York City, for Naomi Reiss.

Max E. Greenberg, Trager, Toplitz & Herbst (Kalvin Kamien, of counsel), New York City, for Max E. Greenberg, Cantor, Trager & Toplitz.

Rivelis, Pawa & Blum (Barry Golomb, of counsel), New York City, for the Minority Interest of Goddard & Blum, Howard Blum, and Barry Golomb.

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

McCURN, Senior District Judge.

St. Paul moves for summary judgment dismissing all claims asserted by Ray Goddard to any of the interpleaded funds (approx. $5 million). St. Paul bases this motion upon its assertion that under New York law, Mr. Goddard's alleged fee agreement and charging lien upon which he bases his claim are unenforceable because Mr. Goddard is not authorized to practice law in New York.

Mr. Goddard opposes this motion on two grounds. First of all, he contends that St. Paul lacks standing to raise the claim that he is engaged in the unauthorized practice of law. Secondly, addressing the merits of St. Paul's motion, Mr. Goddard asserts that his representation of Servidone did not constitute the unauthorized practice of law within the meaning of New York Judiciary Law § 478.

In addition to opposing St. Paul's motion, Mr. Goddard cross-moves for summary judgment. In this regard, he argues that St. Paul lacks standing to challenge his retainer agreement with Servidone and that Servidone has expressly waived all claims to the interpleaded funds. Alternatively, Mr. Goddard contends that St. Paul should be judicially estopped from raising any objections to his fee in the present action because of its actions and conduct in a state court action which also involved the fees earned as a result of the successful prosecution of the same underlying litigation. St. Paul opposes Mr. Goddard's cross-motion in its entirety.

Howard Blum, Barry Golomb and the Minority Interest of Goddard & Blum oppose both of these motions in their entirety.[1] Max E. Greenberg, Cantor, Trager & Toplitz ("the Greenberg firm" or "the MEG firm") submitted an affidavit in response to the cross-motions of Goddard & Blum, Ray Goddard, Howard Blum and Barry Golomb requesting that "[t]o the extent any of the cross-motions are successful, any judgment issued on behalf of Goddard & Blum or its partners should provide for the initial payment of $106,884.25, plus interest from March 31, 1995, to cross-claimant Max E. Greenberg, Cantor, Trager & Toplitz." *See* Kamien Affidavit dated November 21, 1995, at ¶ 5.

The court entertained oral argument on these motions on December 5, 1995, and reserved decision at that time. The court informed counsel that a written decision would be forthcoming. The following memorandum-decision and order constitutes the court's conclusions with respect to these motions.

### BACKGROUND

Without going into great detail concerning the facts which underlie this dispute, suffice it to say that the interpleaded funds which

---

1. These parties also cross-moved for summary judgment requesting that the court determine and order the distribution, including their share, of all amounts paid to Goddard & Blum pursuant to the disposition of this case. Finding that this cross-motion was premature, the court notified the parties that it would not address this cross-motion on December 5, 1995.

At oral argument, Mr. Golomb reiterated that the arguments contained in his memorandum of law were intended as opposition to the pending motions as well as support for his cross-motion. To the extent that these arguments pertain to the issues raised by these motions, the court has considered the same.

are the subject of this dispute resulted from the successful prosecution of a federal contract action which the court will refer to as "the Servidone/Texas matter." The pending motions raise the issue of whether or not Mr. Goddard may rely upon his January 18, 1989, retainer agreement with Servidone Construction Corporation ("Servidone") as a basis for his claim to the interpleaded funds.

Mr. Goddard was a partner in the law firm of Goddard & Blum.[2] Throughout this litigation, he has maintained that he entered into a retainer agreement on January 18, 1989, with Servidone concerning the Servidone/Texas matter pursuant to which Servidone agreed to pay "Ray Goddard his standard and regularly charged legal fees, and the standard legal fees of those with whom he is associated, plus all disbursements in his representation of this matter." *See* Spalj Affidavit dated July 21, 1995, Exhibit B attached thereto. In addition, in this same agreement, Servidone agreed to pay

> Ray Goddard a sum equal to twenty-five (25%) percent of all recoveries obtained, whether by settlement, court decision or otherwise, in excess of Six Million Dollars ($6,000,000), and, in such case, Ray Goddard will refund to me the fees previously charged and/or paid not to exceed fifty (50%) percent of the twenty-five (25%) percent contingency fee.

*See id.*

Mr. Goddard also contends that this retainer agreement was between Servidone and him personally and that Goddard & Blum was not a party to this agreement. As a result of this agreement, Mr. Goddard asserts that he is entitled to a fee of $4,139,478.24 plus interest.

Throughout this litigation, St. Paul has challenged the validity of this retainer agreement and has asserted that Mr. Goddard is not entitled to any fee purportedly earned thereunder. In support of its present motion, however, St. Paul relies solely upon its argument that this agreement is unenforceable because Mr. Goddard's representation of Servidone constituted the unauthorized prac-

tice of law in violation of New York Judiciary Law § 478.

## DISCUSSION

### I. Standing

As a preliminary matter, the court must address an issue that Mr. Goddard raises; i.e., whether St. Paul has standing to raise a claim that he was engaged in the unauthorized practice of law. Although Mr. Goddard uses the term "standing," it is clear that the gravamen of his claim is that St. Paul may not rely upon § 478 as a basis for its challenge to his claim against the interpleaded funds. Mr. Goddard offers two main arguments in support of this position. First of all, he asserts that St. Paul cannot challenge the validity of the retainer agreement because St. Paul was not a party to that agreement. *See* Goddard's Memorandum of Law at 4. Secondly, he contends that St. Paul may not rely upon § 478 because St. Paul is not an intended beneficiary of that statute. *See id.*

In response, St. Paul asserts that although it was not a signatory to the retainer agreement, Mr. Goddard stood in a special or fiduciary relationship to St. Paul with respect to the prosecution of the Servidone/Texas matter despite the lack of an express contractual attorney/client relationship between them. *See* St. Paul's Reply Memorandum of Law at 6. Second, St. Paul contends that it may rely upon § 478 because it is a member of the "public" which § 478 is intended to protect. *See id.* at 8.

There is very little case law concerning the scope of § 478's protection. New York courts which have addressed this issue, however, have concluded that "[i]ts purpose is to protect the public in this State from 'the dangers of legal representation and advice given by persons not trained, examined and licensed for such work, whether they be laymen or lawyers from other jurisdictions.'" *El Gemayel v. Seaman,* 72 N.Y.2d 701, 705, 536 N.Y.S.2d 406, 409, 533 N.E.2d 245, 248

---

**2.** Goddard & Blum no longer exists as a legal entity. Its successor law firm is Goddard, Ronan & Dineen.

(1988) (quoting *Spivak v. Sachs*, 16 N.Y.2d 163, 168, 263 N.Y.S.2d 953, 211 N.E.2d 329 (1965) (construing former Penal Law § 270, the predecessor of Judiciary Law § 478)). The court in *El Gemayel* further explained that "[a]s a matter of public policy, a contract to provide services in violation of the statute is unenforceable in our State courts." *Id.* at 705, 536 N.Y.S.2d at 409, 533 N.E.2d at 248 (citations omitted).

In *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 199 N.Y.S.2d 483, 166 N.E.2d 494 (1960), the New York Court of Appeals addressed the issue of the enforceability of illegal contracts. Although § 478 was not at issue, the *McConnell* court set forth the public policy reasons for refusing to enforce such agreements. In this regard, the court stated that " '[i]t is the settled law of this State (and probably every other State) that a party to an illegal contract **cannot** ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose.' " *Id.* at 469, 199 N.Y.S.2d at 485, 166 N.E.2d at 496 (quoting *Stone v. Freeman*, 298 N.Y. 268, 271, 82 N.E.2d 571, 572, 8 A.L.R.2d 304 (1948) (citing the leading cases)) (emphasis added). The court went on to note that with respect to such an agreement "[t]he court's concern **'is not with the position of the defendant'** but with the question of whether 'a recovery by the plaintiff should be denied for the sake of public interests', a question which is one 'of public policy in the administration of the law.' " *Id.* at 469, 199 N.Y.S.2d at 485, 166 N.E.2d at 496 (quoting *Flegenheimer v. Brogan*, 284 N.Y. 268, 272, 30 N.E.2d 591, 592, 132 A.L.R. 613 (1940)) (emphasis added).

■ When *El Gemayel* and *McConnell* are read together, the court is convinced that St. Paul may rely upon § 478 to challenge the enforceability of Mr. Goddard's retainer agreement with Servidone, despite the fact that St. Paul was not a signatory to that agreement. First of all, the court finds that St. Paul is a member of the public which § 478 is intended to protect. Moreover, the court agrees with St. Paul that the fact that it is incorporated in Minnesota, rather than

in New York, does not change this result. To the extent that St. Paul conducts business in New York and, thus, avails itself of the benefits of New York law, it also is entitled to the protection of the same, including § 478. *See Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

Furthermore, there is nothing in the language of § 478 nor in the case law construing the same which limits its protection to those who are parties to an allegedly illegal agreement. The absence of such a limitation, combined with the public policy considerations that § 478 is intended to protect, render it of no moment that St. Paul is not a signatory to the agreement the enforceability of which it seeks to challenge. If, as St. Paul claims, Mr. Goddard's representation of Servidone constituted the unauthorized practice of law, then he entered into an illegal contract to provide services which, by statute, he could not provide. Under such circumstances, Mr. Goddard may not ask this court to help him reap the benefits of this illegal agreement.

Although not necessary to the court's conclusion that St. Paul may rely upon § 478 to challenge the enforceability of Mr. Goddard's retainer agreement with Servidone, the court notes that St. Paul's argument that Mr. Goddard stood in a fiduciary relationship to St. Paul with respect to the prosecution of the Servidone/Texas matter is very persuasive. Not only was St. Paul Servidone's surety, but it, in fact, paid many of the legal bills associated with this litigation. Under these circumstances, St. Paul certainly could be considered to be in privity with Servidone with respect to the subject agreement and, as such, has a right to challenge its enforceability.

## II. Unauthorized Practice of Law

New York Judiciary Law § 478 provides, in pertinent part, that:

It shall be unlawful for any natural person to practice or appear as an attorney-at-law or as an attorney and counselor-at-law for a person other than himself in a court of record in this state, or to furnish attorneys or counsel or an attorney and counsel to render legal services, or to hold himself

out to the public as being entitled to practice law as aforesaid, or in any other manner, or to assume to be an attorney or counselor-at-law, or to assume, use, or advertise the title of lawyer, or attorney and counselor-at-law, or attorney-at-law or counselor-at-law, or attorney, or counselor, or attorney and counselor, or equivalent terms in any language, in such manner as to convey the impression that he is a legal practitioner of law or in any manner to advertise that he either alone or together with any other persons or person has, owns, conducts or maintains a law office or law and collection office, or office of any kind for the practice of law, without having first been duly and regularly licensed and admitted to practice law in the courts of record of this state, and without having taken the constitutional oath....

N.Y.Jud.Law § 478 (McKinney 1983 & Supp. 1995).

As a preliminary matter, the court finds, and there is no dispute, that Mr. Goddard, although licensed to practice law in the State of Maryland, the United States Court of Federal Claims, and the United States Court of Appeals for the Federal Circuit, is not licensed to practice law in the State of New York. Nor is there any dispute that Mr. Goddard's activities with respect to his representation of Servidone constituted the practice of law. What is in dispute, however, is whether Mr. Goddard's representation of Servidone from his office in New York City constituted the unauthorized practice of law in violation of New York Judiciary Law § 478.

St. Paul relies upon the following activities to support its position that Mr. Goddard was engaged in the unauthorized practice of law. Mr. Goddard maintains a law office in New York City as a partner in the law firm of Goddard & Blum. On occasion, he met with Mr. Servidone and other employees of Servidone in this office. He spent approximately 90% of his time working on the Servidone/Texas matter from the time that the firm of Goddard & Blum was formed until he and the firm were discharged as Servidone's attorneys in July 1992. *See* Goddard Affidavit dated September 7, 1995, at ¶ 15. He

appeared with his partner Gregory Ronan as co-counsel of record in the Servidone/Texas matter in the United States Court of Federal Claims and personally tried the case before that court. *See id.* Moreover, he personally wrote the post-trial and appellate briefs with the assistance of Gregory Ronan and Elizabeth Weaver and personally argued the appeal before the United States Court of Appeals for the Federal Circuit. *See id.*

In addition, Mr. Goddard counseled Servidone in February 1990, regarding the authority of a power of attorney and discussed Servidone's legal relationship with representatives of Servidone in his New York office. *See* Spalj Supplemental Affidavit dated September 18, 1995, Exhibit B at ¶ 36 attached thereto. Finally, Mr. Goddard admitted preparing a confession of judgment for Servidone's execution that was ultimately filed in New York State Supreme Court on August 2, 1991. *See id.,* Exhibit B at ¶ 47 attached thereto.

In response to St. Paul's argument, Mr. Goddard posits two theories to support the contrary position that his activities with respect to his representation of Servidone in the Servidone/Texas matter did not constitute the unauthorized practice of law: (1) New York Judiciary Law § 478 does not, under the circumstances of this case, prohibit the aforementioned activities and (2) Mr. Goddard could engage in these activities notwithstanding New York Judiciary Law § 478. The court will discuss each of these arguments in turn.

*A. New York Judiciary Law § 478 Does Not Prohibit Mr. Goddard's Activities on Behalf of Servidone*

 First of all, Mr. Goddard argues that § 478 does not apply to his activities on behalf of Servidone because he never appeared as an attorney for Servidone in a court of record in New York State. *See* Goddard's Memorandum of Law at 5 (citing Goddard Affidavit, ¶ 16). This argument need not detain the court for long. It is well-settled in New York that "[t]he practice of law forbidden in this State by section 270 of the Penal Law ... **includes legal advice and counsel** as well as appearing in the

courts and holding oneself out as a lawyer."[3] *Spivak v. Sachs,* 16 N.Y.2d 163, 166–167, 263 N.Y.S.2d 953, 955, 211 N.E.2d 329, 330 (1965) (emphasis added) (citing *People v. Alfani,* 227 N.Y. 334, 125 N.E. 671 (1919); *Bennett v. Goldsmith,* 280 N.Y. 529, 19 N.E.2d 927 (1939); *Matter of New York County Lawyers' Assn. [Cool],* 294 N.Y. 853, 62 N.E.2d 398 (1945); *Matter of New York County Lawyers Assn. [Roel],* 3 N.Y.2d 224, 165 N.Y.S.2d 31, 144 N.E.2d 24 (1957)). Therefore, the fact that Mr. Goddard never appeared in a New York State Court on Servidone's behalf is not dispositive of the issue of whether or not he was engaged in the unauthorized practice of law.

Secondly, Mr. Goddard argues that because he never held himself out to the public as being licensed to practice law in New York State courts, nor advertised that he was licensed to practice law in this state's courts, nor ever appeared in a court of record in New York, he was not engaged in the unauthorized practice of law. *See* Goddard's Memorandum of Law at 7. In support of this position, Mr. Goddard cites several opinions of the New York State Bar Association's Committee on Professional Ethics as well as the New York Court of Appeals decision in *New York Criminal and Civil Courts Bar Ass'n v. Jacoby,* 61 N.Y.2d 130, 472 N.Y.S.2d 890, 460 N.E.2d 1325 (1984). In general, each of the Ethics Committee Opinions which Mr. Goddard cites holds that "[p]artnerships may properly be formed between attorneys admitted to practice in different states, if there is no use of a misleading name or other representation which could create a false impression as to the professional position or privileges of a member not locally admitted." New York State Bar Ass'n Committee on Prof. Ethics Opinion 144 (July 2, 1970); *see also* New York State Bar Ass'n Committee on Prof. Ethics Opinion 658 (February 14, 1994) (Disciplinary Rules contemplate formation of partnerships between attorneys from different jurisdictions); New York State Bar Ass'n Committee on Prof. Ethics Opinion 359 (September 10, 1974) (not improper to list among associates of New York law firm on letterhead a member of the Bar of a foreign country with appropriate disclosure of status).

The New York Court of Appeals addressed the same issue in *Jacoby.* The court began its discussion by setting forth the general principal governing the operation of multistate law firms in New York. In this regard, the court stated that

[a] multistate law firm (consisting of partners admitted to practice in different States) may practice law in New York State if at least one of its active partners is admitted to practice in this State, and it may conduct such practice under a firm name comprised of a combination of surnames, although none of them is the surname of a partner licensed to practice in New York. **The firm may use a letterhead and advertisements disclosing the firm name only, but if on either there also appears the name of any individual partner or associate who is not admitted to practice in New York there shall be a clear indication of that fact.**

*Jacoby,* 61 N.Y.2d at 132–33, 472 N.Y.S.2d at 891, 460 N.E.2d at 1325 (emphasis added).

First of all, Mr. Goddard contends that Goddard & Blum's letterhead clearly discloses that he is "admitted to practice in Maryland only." *See* Goddard's Memorandum of Law at 7 (citing Goddard Affidavit, ¶ 14). To the contrary, St. Paul directs the court's attention to a letter written on Goddard & Blum letterhead dated May 24, 1989, which reads as follows:

Goddard & Blum

Ray Goddard
Partner

*See* De Luca Affidavit dated September 13, 1995, Exhibit 5 attached thereto.

Based upon this letter, it would appear that at least on one occasion Goddard & Blum did not comply with the requirements set forth in *Jacoby* or the requirements of the Disciplinary Rules with respect to a law firm's designation on its letterhead of attorneys

---

**3.** Section 270 of the Penal Law was the predecessor statute of New York Judiciary Law § 478.

who are not admitted to practice in New York.[4]

Setting aside this problem for a moment, the more serious issue which this court must resolve is whether Mr. Goddard's activities with respect to his representation of Servidone, not the practices of Goddard & Blum, constituted the unauthorized practice of law. With respect to this issue, neither *Jacoby* nor the Ethics Committee Opinions are dispositive. As the court noted in *Jacoby,*

> [t]here is **no claim** that either Jacoby or Meyers or **any other partner or associate of the firm not admitted to practice law in New York is actually practicing law in the State of New York.** Rather the gravamen of plaintiff's complaint is that use of the firm name is a factual misrepresentation that both of the name partners are available to render legal services in New York.

*Jacoby,* 61 N.Y.2d at 135, 472 N.Y.S.2d at 892–93, 460 N.E.2d at 1327 (emphasis added). In the present case, unlike the situation in *Jacoby,* the gravamen of St. Paul's claim is that Mr. Goddard, a partner in the firm of Goddard & Blum who is not admitted to practice in New York, actually is practicing law in this state.

With respect to this more serious issue, Mr. Goddard argues, among other things, that he was not engaged in the unauthorized practice of law because none of his work for Servidone involved New York law, as the issues in the Servidone/Texas matter were grounded in federal contract law. *See* Goddard's Memorandum of Law at 7. St. Paul counters that this argument misdirects the court's inquiry because the critical question is **where** one is practicing law, **not what jurisdiction's law** is being practiced. *See* St. Paul's Memorandum of Law at 7.

To support its position, St. Paul cites two New York Court of Appeals cases, each of which involved an attorney, who although not licensed to practice law in New York, advised New York clients concerning the laws of a foreign jurisdiction. *See El Gemayel v. Sea-*

*man,* 72 N.Y.2d 701, 536 N.Y.S.2d 406, 533 N.E.2d 245 (1988); *In re Roel,* 3 N.Y.2d 224, 165 N.Y.S.2d 31, 144 N.E.2d 24 (1957).

In *In re Roel,* the attorney, a Mexican citizen admitted to practice in that country, but neither a citizen of the United States nor a member of the New York Bar, maintained an office as a sole practitioner in New York City. At his office, Mr. Roel, among other things, advised members of the public on Mexican law, including Mexican divorce law. *See In re Roel,* 3 N.Y.2d at 227, 165 N.Y.S.2d at 33, 144 N.E.2d at 25. Moreover, he prepared legal papers and documents required for the institution of divorce actions in Mexico and forwarded the same to a lawyer whom he retained in Mexico to represent the client. *See id.* at 227, 165 N.Y.S.2d at 33, 144 N.E.2d at 25. He also took all the steps necessary or required to aid and assist in the procurement of such divorce; gave legal advice and rendered legal services upon other matters pertaining to the laws of Mexico; prepared and drew legal documents, contracts, agreements and other papers applicable and pertaining to the laws of Mexico; and rendered such services and advice within the City and State of New York to residents and citizens of New York. *See id.* at 227, 165 N.Y.S.2d at 33–34, 144 N.E.2d at 25–26. Furthermore, Mr. Roel rendered legal services to citizens and residents of New York to effect a divorce upon grounds not recognized by the laws of New York. He also failed to advise such persons of the legal consequences in New York of their acts, the effect upon their estates, the rights of such persons with respect to their children, or that such proceedings were or might be contrary to the public policy of New York.

On the other hand, Mr. Roel did not give advice as to New York law. Moreover, in his retainer agreement for divorce actions, the client was requested to state that Mr. Roel "assume[s] no responsibility concerning the lack of validity or legal effect" of the divorce decree outside Mexico and that the client has consulted an American lawyer in his own

---

4. The court notes in passing that St. Paul does not contend that the law firm of Goddard & Blum may not practice law in New York or that "Goddard & Blum" is an improper name for the

firm. Nor does St. Paul dispute Mr. Goddard's assertion that several of the partners of Goddard & Blum are licensed to practice law in this state.

state. *See id.* at 228, 165 N.Y.S.2d at 34, 144 N.E.2d at 26.

In response to petitioner's argument that he was practicing law in New York without being licensed to do so, Mr. Roel argued that (1) he did not practice law in New York because he only gave advice and prepared instruments based on Mexican law, and Mexican law is not New York law; (2) if he were deemed to practice "law," he practiced only Mexican law and therefore did not violate § 270 of the Penal Law; and (3) if he were subject to § 270 of the Penal Law, that statute was unconstitutional. *See id.* at 228, 165 N.Y.S.2d at 34, 144 N.E.2d at 26.

The court found, first of all, that the activities in which Mr. Roel engaged constituted the practice of law. *Id.* at 228, 165 N.Y.S.2d at 35, 144 N.E.2d at 26. In doing so, the court stated that it was

> [e]xamining the nature of the activities performed by [Mr. Roel], not the sources of authority of the law which he practices. Whether a person gives advice as to New York law, Federal law, the law of a sister State, or the law of a foreign country, he is giving legal advice. Likewise, when legal documents are prepared for a layman by a person in the business of preparing such documents, that person is practicing law whether the documents be prepared in conformity with the law of New York or any other law. To hold otherwise would be to state that a member of the New York Bar only practices law when he deals with local law, a manifestly anomalous statement.

*In re Roel,* 3 N.Y.2d at 229, 165 N.Y.S.2d at 35, 144 N.E.2d at 26.[5]

The court went on to explain the rationale for its decision. In this regard, the court noted that "[p]rotection of the members of the lay public of our State, when they seek *legal advice* . . . is the basis of the requirements of licensing of attorneys by the State, and this protection must be deemed to embrace whatever kind of law or legal rights the layman seeks advice on." *Id.* at 231, 165

N.Y.S.2d at 37, 144 N.E.2d at 28 (emphasis in original) (citation omitted). Moreover, the court noted that despite the fact that a foreign lawyer may be considered to be a specialist in a particular field of law, he "[i]s nevertheless a layman in this State when he is not a member of the Bar here." *Id.* at 231, 165 N.Y.S.2d at 37, 144 N.E.2d at 28. Therefore, like any other layman who may have a specialized area of competence, he may not give legal advice based upon his knowledge of that particular subject. *Id.* Finally, the court concluded that it was "[n]ot unreasonable to require that a person desiring to engage in the practice of foreign law be admitted to the Bar here and be subject to the same rules as every other member of the Bar of this State." *Id.* at 233, 165 N.Y.S.2d at 38, 144 N.E.2d at 29.

As an alternative policy reason for its holding, the court noted that

> [t]he conduct of attorneys admitted here may be regulated by our courts . . . and dealt with when they engage in unethical practices; they may not plead in defense that since the matter involved related to the law in New Jersey or Connecticut or anywhere outside of our jurisdiction, they were not practicing law and were therefore immune from disciplinary action. A foreign law specialist, on the other hand, is not subject to discipline, he need not be a lawyer of any jurisdiction; he may be without good character; and his activities may not even be regulated under the present state of the law.

*Id.* at 232, 165 N.Y.S.2d at 37–38, 144 N.E.2d at 28.

Mr. Goddard argues that *In re Roel* is distinguishable from the present case for a number of reasons. First of all, he asserts that although Mr. Roel was a sole practitioner, he worked with his partners at Goddard & Blum who were licensed to practice law in New York State. *See* Goddard's Memorandum of Law at 8 (citing Goddard Affidavit, ¶¶ 9–10, 14–15). In fact, he notes that although he was lead counsel in the Servi-

---

5. The court went on to cite several previous decisions to demonstrate that in the past in dealing with the question of what constituted the unauthorized practice of law, it had not limited

such practice to New York law. *See In re Roel,* 3 N.Y.2d at 230, 165 N.Y.S.2d at 36, 144 N.E.2d at 27.

done/Texas matter, Gregory Ronan served as co-counsel of record. *See id.* (citing Goddard Affidavit ¶ 15). Finally, he states that unlike the situation in *In re Roel,* none of the legal work or advice he provided to Servidone involved Servidone's status or rights as a New York corporation. *See id.* at 7.

It is true that there are factual differences between *In re Roel* and the present case.[6] Nonetheless, *In re Roel* clearly stands for the proposition that an attorney who is not licensed to practice in New York may not establish an office in New York from which he advises clients about legal matters, whether this advice concerns New York law or the law of another jurisdiction. Whether Mr. Goddard's association with Goddard & Blum insulates him from this holding is a question left unanswered by *In re Roel.*

Although St. Paul and Mr. Goddard disagree about the import of *In re Roel,* both of these parties cite *El Gemayel* to support their respective positions. In *El Gemayel,* the attorney-plaintiff who resided in Washington D.C., and maintained an office at Georgetown University where he served as a Middle Eastern law consultant, was admitted to practice in Lebanon but not in any jurisdiction in the United States. The defendant, a resident of New York, sought Mr. El Gemayel's advice concerning whether Lebanese courts would honor a Massachusetts custody decree in favor of her daughter Mary. In a letter addressed to the defendant's daughter in Massachusetts, Mr. El Gemayel rendered his legal opinion that Lebanese courts would honor the decree. He billed the defendant's daughter $2,000 for his services and was paid in full.

The defendant and her daughter remained in regular contact with Mr. El Gemayel who agreed to assist them in getting the child back and the defendant agreed to pay his fees and expenses. Mr. El Gemayel performed the bulk of his services in Lebanon. His **only** contacts with New York were his frequent phone calls to the defendant and her daughter in Phoenix, New York, to report on and discuss the progress of the case.

*See El Gemayel,* 72 N.Y.2d at 704, 536 N.Y.S.2d at 408, 533 N.E.2d at 247. In addition, he made a single visit to Phoenix, New York to return luggage which the defendant's daughter had left in Lebanon. While there, he discussed his bill with the defendant.

After the defendant refused to pay his bill, Mr. El Gemayel commenced an action asserting causes of action in contract and quantum meruit. In response, the defendant asserted, as an affirmative defense, that because Mr. El Gemayel had engaged in the unauthorized practice of law within the meaning of § 478, any contract for his services was unenforceable. *See id.* at 704, 536 N.Y.S.2d at 408, 533 N.E.2d at 247. As a preliminary matter, relying in part upon *In re Roel,* the court held that the practice of Lebanese law fell within the purview of § 478. *Id.* at 706, 536 N.Y.S.2d at 409, 533 N.E.2d at 248. The court went on to define the issue before it as "[w]hether plaintiff's activities in New York appropriately can be considered the 'practice' of Lebanese law." *Id.* at 706, 536 N.Y.S.2d at 409, 533 N.E.2d at 248. In this regard, the court stated that

> [t]he "practice" of law reserved to duly licensed New York attorneys includes the rendering of legal advice as well as appearing in court and holding oneself out to be a lawyer.... Additionally, such advice or services must be rendered to particular clients ... and services rendered to a single client can constitute the practice of law....

*Id.* at 706, 536 N.Y.S.2d at 409, 533 N.E.2d at 248.

The court distinguished the case before it from *Spivak v. Sachs,* 16 N.Y.2d 163, 263 N.Y.S.2d 953, 211 N.E.2d 329 (1965), in which a California attorney assisted an acquaintance with her divorce in New York. In the course of this assistance, the attorney in *Spivak* spent fourteen days in New York attending meetings; reviewing drafts of a separation agreement; discussing his client's financial and custody problems; recommending a change in New York counsel; and,

---

6. The court notes that *In re Roel* was not a case in which a client had refused to pay Mr. Roel's fee and Mr. Roel sued to recover the same. Rather, a Bar Association brought suit to enjoin Mr. Roel from continuing his practice of law in New York.

based upon his knowledge of New York and California law, rendering his opinion as to the proper jurisdiction for the divorce action and related marital and custody issues. *See El Gemayel*, 72 N.Y.2d at 706, 536 N.Y.S.2d at 409, 533 N.E.2d at 248 (citing *Spivak* at 167, 263 N.Y.S.2d 953, 211 N.E.2d 329). The *Spivak* court held that these activities constituted the unauthorized practice of law. In so holding, however, the *Spivak* court noted that the statute (Section 270 of the Penal Law) should not be construed to prohibit "customary and innocuous practices." *See El Gemayel*, 72 N.Y.2d at 706, 536 N.Y.S.2d at 409, 533 N.E.2d at 248.

Distinguishing *Spivak*, the court in *El Gemayel* found that Mr. El Gemayel's contacts with New York were incidental and innocuous. In this regard, the court found that

> [a]lthough plaintiff engaged in substantial litigation in Lebanon, where he was licensed, and even arguably provided legal services while in Washington, D.C., and Massachusetts, his contact with New York consisted entirely of phone calls to defendant and her daughter Mary in New York in which they discussed the progress of the legal proceedings in Lebanon. There was but a single visit to Phoenix, New York, after the successful completion of his legal services.

*Id.* at 707, 536 N.Y.S.2d at 409–410, 533 N.E.2d at 249. Under such circumstances, the court held that phone calls to a client in New York to advise that client of the progress of legal proceedings in a foreign jurisdiction did not, without more, constitute the "practice" of law in New York in violation of § 478. *Id.* at 707, 536 N.Y.S.2d at 410, 533 N.E.2d at 249.

Mr. Goddard argues that, despite St. Paul's statement to the contrary, *El Gemayel* supports his position rather than St. Paul's. In this regard, he asserts that Mr. El Gemayel's legal services and advice, like his, related to actions pending in jurisdictions in which each was admitted to practice. *See* Goddard's Memorandum of Law at 9. Moreover, he contends that like Mr. El Gemayel, he did not counsel his client about its rights or liabilities under New York law. *See id.* at 10.

In contrast to these similarities, Mr. Goddard argues that the only difference between him and Mr. El Gemayel is that Mr. El Gemayel initiated his phone calls to New York from outside the State and drafted legal documents in an office outside of the State. *See id.* Moreover, Mr. Goddard asserts that the fact that he was physically present in New York when he performed a portion of the services with respect to the Servidone/Texas matter is not dispositive because at all times he was working in direct association and partnership with, and as co-counsel to, members of his firm who were licensed to practice law in New York. *See id.* Thus, Mr. Goddard argues that to invalidate his retainer agreement with Servidone " 'would impair the ability of New York residents to obtain legal advice in foreign jurisdictions on matters relating to those jurisdictions since the foreign attorneys would be unable to recover for their services unless they were licensed both in New York as well as the foreign jurisdiction.' " *Id.* at 10–11 (quoting *El Gemayel*, 72 N.Y.2d at 707, 536 N.Y.S.2d at 410, 533 N.E.2d at 249).

Although there are similarities between Mr. Goddard's activities and those of Mr. Gemayel, there are also significant differences. First and foremost, the court in *El Gemayel* based its decision, at least in part, upon its conclusion that Mr. El Gemayel's contacts with New York were incidental and innocuous. The same cannot be said of Mr. Goddard's contacts with this State. Unlike Mr. El Gemayel, Mr. Goddard maintains an office in New York City, which is the only office from which he engages in the practice of law. Moreover, although Mr. Gemayel's phone calls to his New York client apparently were made only to inform her of the progress of the case, Mr. Goddard met with representatives of Servidone in his New York office to discuss issues which, arguably, were only tangentially related to the prosecution of the Servidone/Texas matter; i.e., the effects of a power of attorney and the drafting of a confession of judgment—both of which concerned his fee rather than the merits of the litigation itself. Therefore, given Mr. Goddard's significant contacts with New York State, the court concludes that *El Ge-*

*mayel* is not dispositive of Mr. Goddard's situation.

Mr. Goddard also attempts to distinguish *Spivak.* He argues that *Spivak* is not controlling because the attorney in *Spivak* advised his New York client concerning her rights and liabilities under New York and Connecticut law, two jurisdictions where he was not licensed to practice law, whereas Mr. Goddard represented Servidone on a federal claim in the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit where he was licensed to practice. *See* Goddard's Memorandum of Law at 9. Moreover, Mr. Goddard attempts to distinguish *Spivak* on the grounds that, unlike him, the attorney in *Spivak* was not practicing in partnership with attorneys licensed to practice in New York. *See id.*

The court's review of *Spivak* leads it to conclude that some of Mr. Goddard's distinctions are strained. As noted above, in *Spivak,* a California attorney assisted a New York resident with a divorce proceeding. When his client, who was an acquaintance, contacted him, Mr. Spivak informed her that he was not licensed to practice in New York and could do no more than consult with her, advise her and recommend New York counsel.[7] *See Spivak,* 16 N.Y.2d at 166, 263 N.Y.S.2d at 955, 211 N.E.2d at 330. Despite this caveat, he spent fourteen days in New York attending meetings, reviewing drafts of a separation agreement, discussing the client's financial and custody problems, recommending changes in New York counsel, and rendering an opinion as to the proper jurisdiction for the divorce action and related marital and custody issues.

Mr. Spivak claimed that although not admitted to the New York Bar, he still might collect his fee for legal services performed because what he did was a "single, isolated incident" and not the "practice" of law. *See id.* at 167, 263 N.Y.S.2d at 955, 211 N.E.2d at 330. The court disagreed. First of all, the court noted that Mr. Spivak was brought to New York not for a conference or to look over a document but to advise directly with a New York resident as to very important marital rights and problems. *See id.* at 167, 263 N.Y.S.2d at 956, 211 N.E.2d at 331. Moreover, the court held that "[t]he statute aims to protect our citizens against the dangers of legal representation and advice given by persons not trained, examined and licensed for such work, whether they be laymen or lawyers from other jurisdictions." *Spivak,* 16 N.Y.2d at 168, 263 N.Y.S.2d at 956, 211 N.E.2d at 331. Mr. Goddard relies upon this last statement to argue that the dangers presented by Mr. Spivak's advice to his client concerning the laws of New York and Connecticut, two jurisdictions in which he was not licensed, are not present here because he had years of experience and was licensed to practice in the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit. *See* Goddard's Memorandum of Law at 9.

Like the situation in *Spivak,* Servidone hired Mr. Goddard as its sole legal representative to advise it directly about very important federal contract problems. It did not hire him to consult with another attorney whom it had also hired and who was licensed to practice in New York. Although Mr. Goddard may have had many years of experience in federal contract law, he was not examined or licensed for such work within the State of New York. Therefore in reliance upon *Spivak,* the court finds that Mr. Goddard's activities constituted the unauthorized practice of law. Left unanswered by *Spivak,* however, is the question of whether or not Mr. Goddard's personal decision to associate himself with Gregory Ronan, and later Goddard & Blum, in the absence of any agreement between Servidone and these attorneys changes this result.

As the above-cited cases demonstrate, given the rather unique circumstances of this case, the question of whether Mr. Goddard's representation of Servidone constituted the unauthorized practice of law in violation of § 478 is not as easily answered as one might suppose at first glance. Had Mr. Goddard been a "sole practitioner" as that term is

---

7. The court notes that there is nothing in the record to indicate that Mr. Goddard ever informed Servidone that he was not licensed to practice law in New York.

commonly understood, there is no question that his representation of Servidone would have run afoul of § 478. What complicates this picture, however, is Mr. Goddard's status as a partner in the law firm of Goddard & Blum, some of whose partners and associates are licensed and admitted to practice law in the State of New York. Mr. Goddard contends that because of his association with this firm, his representation of Servidone does not violate § 478. He notes, for example, that Gregory Ronan appeared as co-counsel of record with him in the United States Court of Federal Claims and that Gregory Ronan and Elizabeth Weaver assisted him in preparing the appeal to the United States Court of Appeals for the Federal Circuit. *See* Goddard Affidavit at ¶ 15.

As noted above, what makes this argument troublesome is that Mr. Goddard has maintained throughout this litigation that Goddard & Blum is not a party to the retainer agreement pursuant to which he claims entitlement to the interpleaded funds. Rather, he contends that the retainer agreement was between Servidone and him personally and that Servidone was never a client of Goddard & Blum. He does assert, however, that "Servidone expressly understood [when it signed the retainer agreement] that Ray Goddard would be working with other counsel, and expressly agreed, among other things, to pay the standard hourly fees charged by Ray Goddard, and 'those with whom he is associated.'" *See* Goddard's Memorandum of Law at 1–2 (citing Exhibit A to the Amended Cross–Petition of Ray Goddard; Goddard Affidavit, ¶ 12).

It appears to the court that Mr. Goddard is trying to have it both ways. He attempts to use his alliance with Goddard & Blum to circumvent the requirements of § 478 while at the same time arguing that he was Servidone's sole legal representative with respect to the Servidone/Texas matter. Moreover, it is undisputed that at the time he entered into this agreement, Goddard & Blum did not exist and, thus, he could not have signed the agreement as an agent of Goddard & Blum. Under such circumstances, a persuasive ar-

gument can be made that at the time Mr. Goddard entered into the retainer agreement with Servidone, he was, for all intents and purposes, a sole practitioner.

Furthermore, the court is not entirely convinced that Mr. Goddard's activities do not run afoul of § 478 even if he is considered to be associated with Goddard & Blum. As the court in *Jacoby* noted in dicta, an attorney who is not licensed to practice law in New York, even if he is associated with a properly constituted law firm in New York, may not "practice" law in this state. *See Jacoby,* 61 N.Y.2d at 136, 472 N.Y.S.2d at 893, 460 N.E.2d at 1327. Under this principle, it would appear that Mr. Goddard's act of entering into an individual retainer agreement with Servidone pursuant to which he undertook the prosecution of the Servidone/Texas matter as Servidone's sole legal representative constitutes the unauthorized practice of law within the meaning of § 478 irrespective of his relationship with Goddard & Blum.

### B. Mr. Goddard Could Engage in These Activities Notwithstanding New York Judiciary Law § 478

Alternatively, Mr. Goddard argues that his activities with respect to the Servidone/Texas matter are insulated from the limited reach of § 478 because he is licensed to practice in the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit where the Servidone/Texas matter was litigated. *See* Goddard's Memorandum of Law at 15. Thus, he asserts that it was lawful for him to represent Servidone as its co-counsel of record and to perform all legal services incidental and necessary for the prosecution of that matter. *See id.*

The Bankruptcy Court for the United States District Court for the District of Connecticut recently addressed a very similar issue. *See In re Peterson,* 163 B.R. 665 (Bkrtcy.D.Conn.1994). In *Peterson,* an attorney who was not admitted to practice law in Connecticut, nonetheless maintained an office in that state where he engaged in the practice of bankruptcy law.[8] The petitioner

---

**8.** The attorney, Mr. Betsos, was licensed to practice law in New York and was admitted to prac-

tice in the federal district courts for the district of Connecticut and the southern and eastern

argued that because he was authorized to practice law in the United States District Court for the District Court of Connecticut, he was, therefore, authorized to practice bankruptcy law generally notwithstanding Connecticut General Statute § 51–88(a), a statute similar to New York Judiciary Law § 478.

As a preliminary matter, the court noted that in order to accept the petitioner's proposition it would have

> [t]o find that there are two bases for the right to practice law in Connecticut: an attorney may be licensed by the state in accordance with its statutes and rules or, in the alternative, that person may generally practice law if he or she is authorized to practice in the United States District Court for the District of Connecticut.

*In re Peterson*, 163 B.R. at 673.

The court stated that

> [t]he flaw in that argument is that it fails to recognize the distinction between the right to practice in a court and the right to practice law *generally*. The essence of that distinction is that the general practice of law connotes the right to offer legal services to anyone who seeks them, whereas the right to practice in a court is limited to providing legal services that are incidental to a specific case or proceeding pending in that court.

*Id.* at 673 (emphasis in original).

The court continued by stating that "[t]he regulation of the right to practice law generally, unless otherwise prescribed by Congress, is traditionally left to the states." *Id.* (citing *Leis v. Flynt*, 439 U.S. 438, 442, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979) (per curiam)). Moreover, the court noted that "[C]ongress could enact statutes providing for the licensing of individuals to practice in specific areas of federal law, and those statutes would preempt incompatible state laws." *Id.*

As an example of the latter situation, the court cited *Sperry v. Florida*, 373 U.S. 379,

83 S.Ct. 1322, 10 L.Ed.2d 428 (1963). Mr. Goddard also relies upon *Sperry* for his argument that under the circumstances of this case, § 478 does not apply to him because he is admitted to practice in the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit. In *Sperry*, the petitioner was a non-lawyer practitioner registered to practice before the United States Patent Office. The Court struck down a state court injunction that prohibited him from practicing patent law because a federal statute specifically authorized that practice by non-attorneys who were deemed qualified by the Commissioner of Patents. In this regard, the Court stated that

> [a] State may not enforce licensing requirements which, though valid in the absence of federal regulation, give "the State's licensing board a virtual power of review over the federal determination" that a person or agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress.

*Id.* at 385, 83 S.Ct. at 1326.

The court went on to hold that the federal statute at issue

> [d]oes not authorize the general practice of patent law, but sanctions only the performance of those services which are reasonably necessary and incident to the preparation and prosecution of patent applications.... [T]he State maintains control over the practice of law within its borders except to the limited extent necessary for the accomplishment of the federal objectives.

*Id.* at 386, 402, 83 S.Ct. at 1326, 1335 (footnote omitted) (quoted in *In re Peterson*, 163 B.R. at 674 (footnote omitted)).

As the court noted in *In re Peterson*, "[e]xcept in a few specialized areas such as patent law, 'Congress thus far has chosen to leave regulation of the federal bars to the courts.'"

districts of New York. He maintained a law office in Connecticut from which he provided legal services by phone in bankruptcy matters. In addition, he prepared pleadings in that office

for filing in bankruptcy court. His letterhead listed his Connecticut office address and stated that he was an attorney-at-law. *See In re Peterson*, 163 B.R. at 667.

*In re Peterson,* 163 B.R. at 674 (quoting *Frazier v. Heebe,* 482 U.S. 641, 646 n. 4, 107 S.Ct. 2607, 2611 n. 4, 96 L.Ed.2d 557 (1987)). Thus, as was the case in *In re Peterson,* the present case "[t]urns on the scope of the authorization granted by [Rule 81 of the Rules of the United States Court of Federal Claims and Rule 46 of the Rules of the United States Court of Appeals for the Federal Circuit]." *Id.*

◼ As the court in *In re Peterson* noted [t]he contours of the so-called "federal practice exception"—pursuant to which individuals acting within the scope of an authorization to practice before a federal court are not in violation of a state statute prohibiting the unauthorized practice of law—are not sharply defined. There is, of course, no question that the right to practice in a federal court includes the right to appear there not withstanding state laws which regulate the practice of law.

*Id.* at 674 (citations omitted).

An en banc Second Circuit decision sheds some light on the contours of this "federal practice exception" which has some bearing on the issues presented by the instant case.

In *Spanos v. Skouras Theatres Corp.,* 364 F.2d 161 (2d Cir.), *cert. denied,* 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966), an attorney licensed to practice in California and specializing in antitrust law was engaged by a New York citizen to assist in the prosecution of a federal antitrust suit in the United States District Court for the Southern District of New York for a period of several years. During that time, the attorney maintained his California office and practice and frequently returned there. Although he eventually moved to New York, he did not seek admission to the bar of New York or to the bar of the district court. When his client declined to pay him, arguing that he had engaged in the unauthorized practice of law, the district court ruled that his fee was appropriate. A panel of the Second Circuit reversed, but upon a rehearing en banc, the full panel of the Second Circuit affirmed the district court's judgment.

The Second Circuit's holding that the plaintiff attorney was entitled to his fee and had not been engaged in the unauthorized practice of law was based upon the fact that when the defendants had hired him "[t]hey impliedly assumed the obligation of having their New York lawyers in the action make any motion that was necessary to render [his appearances in federal court] lawful." *Spanos,* 364 F.2d at 168. Moreover, the court found that had the defendants' attorneys moved for admission of the plaintiff pro hac vice the court's granting of that motion "[w]ould have given official recognition to his status as an attorney in the district for all purposes of the action and would have insulated him from § 270 of the New York Penal Law with respect to any legal services reasonably incident to the activities the District Court had authorized." *Id.* at 169. Under these circumstances, the court concluded that the plaintiff's "[c]ontract was thus susceptible of being lawfully performed without his being admitted to the New York bar and cannot be considered an illegal bargain." *Id.*

After reaching this conclusion, the court went on to consider other grounds that had been urged for affirmance. In this regard, the New York County Lawyers' Association suggested that the plaintiff may have acted under the control and supervision of duly admitted New York attorneys who alone were responsible to the defendants, similar to the status of an unlicensed law clerk which had never been supposed to violate § 270 in the absence of court appearance or a holding out as the giver of independent legal advise. *See id.* at 169. In discussing this theory, the court began by setting forth the competing arguments. It noted that

[i]t is clear there was no thought of Spanos being the sole lawyer in the industry suit. Defendants' initial proposal was that he prepare the case for trial by Eugene Sherpick, a prominent New York trial lawyer; Spanos agreed to come to New York only on the understanding that he was to be associated with Dean Landis whom he wanted to be his "link to this case"; and when Mr. Sherpick and Dean Landis formally withdrew in 1956, the agreement between the defendants and Mr. Weisman's firm for continuing the litigation stated that the firm should "have the aid

and cooperation of Nick Spanos." On the other hand, the record would not support a conclusion that Spanos' relations with the New York lawyers bore any real analogy to that between a law clerk and his employer. Spanos felt free to criticize the New York lawyers to the client and insisted he "was to have a status in the case full and equal with that of every other lawyer," including Mr. Sherpick and Dean Landis; moreover he was generally paid, and ultimately discharged, not by any of the New York lawyers but by the defendants, and claimed an attorney's lien.

*Spanos*, 364 F.2d at 169.

Despite these competing arguments, the court found it unnecessary to determine the precise contours of the relationship or to determine whether the New York Court of Appeals would consider the plaintiff's conduct in violation of § 270 of the Penal Law. *Id.* at 169–70. This was so because the court held that "[u]nder the privileges and immunities clause of the Constitution no state can prohibit a citizen with a federal claim or defense from engaging an out-of-state lawyer to **collaborate with an in-state lawyer** and give legal advice concerning it within the state." *Id.* at 170 (emphasis added). The court went on to state that

> [i]n an age of increased specialization and high mobility of the bar, this must comprehend the right to bring to the assistance of an attorney admitted in the resident state a lawyer licensed by "public act" of any other state who is thought best fitted for the task, and to allow him to serve in whatever manner is most effective, subject only to valid rules of courts as to practice before them.

*Id.* at 170 (citation omitted).

Despite these general pronouncements, however, the court

> [l]imit[ed] [its] holding to the situation here presented, **where a citizen has invited a duly licensed out-of-state lawyer to work in association with a local lawyer on a federal claim or defense.** Whether § 270 of the New York Penal Law could apply if the client in such a case dispensed with the local attorney or if the matter were one in which federal jurisdiction rest-

ed only on diverse citizenship, are questions better left to another day. **And we in no way sanction a practice whereby a lawyer not admitted to practice by a state maintains an office there and holds himself out to give advice to all comers on federal matters.**

*Spanos*, 364 F.2d at 171 (emphasis added).

Although the above-cited discussion is only dicta, the court finds it instructive with respect to the issue presented by the instant case. There appears to be no dispute that Servidone engaged Mr. Goddard's services because of his expertise in the field of federal contract law. Nor can it be denied that under certain circumstances § 478 would not render such an agreement unlawful. What is troubling here, however, is the fact that there is no evidence of any intention on Servidone's part to engage an attorney licensed to practice in New York to collaborate with Mr. Goddard in defense of its federal claim.

Mr. Goddard has asserted throughout this litigation that Goddard & Blum was not a party to the retainer agreement pursuant to which Servidone engaged the services of Mr. Goddard to pursue its federal contract claim. Moreover, Mr. Goddard has maintained that Servidone was never a client of Goddard & Blum. Thus, the court concludes that, based upon his own admissions, Mr. Goddard was the **sole** representative of Servidone with respect to its federal claim. This is precisely the situation which in dicta the court in *Spanos* declined to sanction. The fact that Mr. Goddard may have relied upon the assistance of Mr. Ronan and others in the law firm of Goddard & Blum does not change the fact that Servidone did not contract with Goddard & Blum for its services. Lacking such an agreement, Mr. Goddard, an unlicensed attorney, was the **only** attorney with any obligation to Servidone for the prosecution of the Servidone/Texas matter.

Moreover, it is troubling to the court that Mr. Goddard's **only** law office is located in New York City and that there is no indication that this office was established merely for the convenience of representing Servi-

done in the Servidone/Texas matter. As the court noted in *In re Peterson,*

> [t]here is a difference, ..., between maintaining an office in this state for the convenience of litigating a matter in this court and maintaining such an office for the purpose of giving legal advice on [federal matters] to all clients who seek it and accepting all cases which can be filed [in the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit].

*In re Peterson,* 163 B.R. at 675.
Under the particular circumstances of this case, the court is consigned to conclude that Mr. Goddard's representation of Servidone constituted the unauthorized practice of law in violation of New York Judiciary Law § 478.

Furthermore, the court concludes that § 478 as it applies to this situation is not preempted by any federal statute. The rules of the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit, as well as the privileges and immunities clause of the United States Constitution, do not require that New York permit an attorney, who is not licensed to practice in this state, to establish a law firm in New York from which he provides advice to clients and litigates issues that are within the province of these foreign courts.

What these rules do provide, however, is that New York may not prevent such an attorney, hired by a client to collaborate with another attorney duly licensed to practice in this state, hired by the same client, from giving legal advice concerning that client's federal claim within this state. New York Judiciary Law § 478 has never been held to prevent such collaboration; and had Servidone hired Goddard & Blum or both Goddard & Blum and Ray Goddard to prosecute the Servidone/Texas matter, Mr. Goddard's activities would, more than likely, not have violated § 478. Nonetheless, adopting as it

must Mr. Goddard's statement that he was Servidone's sole legal representative with respect to the Servidone/Texas matter, the court is convinced that Mr. Goddard's representation of Servidone constituted the unauthorized practice of law in violation of § 478.

Having found that Mr. Goddard was engaged in the unauthorized practice of law, the next question is what is the consequence of this conclusion. It is well-settled in New York that "[a]s a matter of public policy, a contract to provide services in violation of [§ 478] is unenforceable ..." *El Gemayel,* 72 N.Y.2d at 705, 536 N.Y.S.2d at 409, 533 N.E.2d at 248 (citing *Spivak v. Sachs,* 16 N.Y.2d at 168, 263 N.Y.S.2d 953, 211 N.E.2d 329; *McConnell v. Commonwealth Pictures Corp.,* 7 N.Y.2d 465, 199 N.Y.S.2d 483, 166 N.E.2d 494).[9] Furthermore, when an attorney's fee agreement is unlawful, the attorney has no lien for services performed pursuant to that agreement. *See* 1907 Op.Atty.Gen. 300. Nor may he maintain an action for quantum meruit for such services. *See Charlebois v. J.M. Weller Assocs., Inc.,* 72 N.Y.2d 587, 593, 535 N.Y.S.2d 356, 359, 531 N.E.2d 1288, 1291 (1988). Thus, to the extent that Mr. Goddard's claim to the interpleaded funds rests upon his retainer agreement with Servidone, it must be dismissed.

### III. Cross-motion for Summary Judgment

Mr. Goddard's cross-motion for summary judgment is based upon his claim that he is the only remaining party with a valid claim to the interpleaded funds. In support of this argument, he asserts that St. Paul lacks standing to challenge the enforceability of the retainer agreement and that Servidone expressly waived all claims it had to these funds as part of its settlement agreement with St. Paul.[10]

With respect to Servidone, Mr. Goddard argues that Servidone gave up all of its

---

9. Moreover, as the court in *El Gemayel* noted, violation of § 478 is a misdemeanor and its provisions may be enforced by the Attorney General or a bar association formed in accordance with the laws of the State of New York. *See El Gemayel,* 72 N.Y.2d at 706, 536 N.Y.S.2d at 409, 533 N.E.2d at 248.

10. With respect to St. Paul's ability to challenge the enforceability of Mr. Goddard's retainer agreement with Servidone, see Section I *supra.*

claims to the interpleaded funds as part of its settlement agreement with St. Paul. *See* Goddard's Memorandum of Law at 17. In response, St. Paul asserts that this argument is contradicted by the terms of the settlement agreement itself. *See* St. Paul's Reply Memorandum of Law at 17. To support its position, St. Paul directs the court's attention to the agreement itself which provides that Servidone's "[r]elinquishment of claims to the funds is not intended, nor shall it operate as, a release of any claims against Ray Goddard and Goddard & Blum." *See id.* at 18 (quoting Settlement Agreement attached to the Affidavit of Ray Goddard as Exhibit C at ¶ 3). The agreement goes on to provide that the release exchanged between Servidone and St. Paul "[i]s not intended to, nor shall it be construed as, a release, waiver or discharge of any claims or rights St. Paul or First Bank may have against Ray Goddard, Goddard & Blum, or any members of the law firm of Goddard & Blum." *See id.* (quoting Settlement Agreement at ¶¶ 1 and 2). Finally, the settlement agreement provides that "St. Paul and Servidone intend to pursue all of their claims against Ray Goddard and Goddard & Blum." *See id.* (quoting Settlement Agreement at ¶ 5).

Alternatively, St. Paul argues that although Servidone may have relinquished its claim to the interpleaded funds per se, it did not relinquish any claims against Ray Goddard and, therefore, may still take advantage of § 478 as a basis for its claims against him. *See id.* In this regard, St. Paul notes that Servidone has made claims against Ray Goddard distinct from claims to the interpleaded funds. *See* St. Paul's Reply Memorandum of Law at 18. For example, Servidone seeks satisfaction and removal from the public records of New York State of the Confession of Judgement which Mr. Goddard exacted from Servidone in the amount of $4,823,851.20; a finding that Mr. Goddard and Goddard & Blum have forfeited any claim for legal fees with respect to the Servidone/Texas matter; and disgorgement of approximately $1.1 million paid to Goddard & Blum and/or Mr.

Goddard for services rendered in connection with the Servidone/Texas matter. *See id.*

Given the language of the settlement agreement, as well as the claims alleged in Servidone's pleading against Mr. Goddard and Goddard & Blum, the court concludes that Servidone's claims against these parties survive its settlement agreement with St. Paul.[11] Therefore, the court denies Mr. Goddard's motion for summary judgment on these grounds.

As an alternative argument in support of his cross-motion, Mr. Goddard asserts that St. Paul is judicially estopped from disputing the validity of the subject retainer agreement because of St. Paul's actions and conduct in the state court proceedings. *See* Goddard's Memorandum of Law at 17–18. In response, St. Paul argues that Mr. Goddard's and Mr. Dineen's affidavits characterizing the state court proceedings are false. *See* St. Paul's Reply Memorandum of Law at 19.

"The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding." *Bates v. Long Island R.R. Co.,* 997 F.2d 1028, 1037 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993). Two elements must be met for this doctrine to apply. "First, the party against whom the estoppel is asserted must have argued an inconsistent position in a prior proceeding; and second, the prior inconsistent position must have been adopted by the court in some manner." *Id.* at 1038.

In the present case, Mr. Goddard asserts that St. Paul's position in this case that he did not earn a contingent bonus fee in the Servidone/Texas matter is contrary to the position St. Paul advanced in the state court action pursuant to which the MEG firm sought to recover a portion of Mr. Goddard's fee. *See* Goddard's Memorandum of Law at 17. In this regard, Mr. Goddard claims that St. Paul argued, and the Special Referee agreed, that Goddard & Blum was liable to St. Paul, as an assignee of MEG, for a share

11. Despite this conclusion, the court takes no position with respect to the merits of Servidone's claims.

of the fees that he earned. *See id.* at 19. Mr. Goddard goes on to argue that the court's decision in favor of St. Paul and against Goddard & Blum necessarily included a finding by the Special Referee that a contingent fee had been earned. *See id.* (citing Dineen Affidavit, ¶¶ 13–16 and Exhibit 8–10). Moreover, he contends that because the state court confirmed the finding of the Special Referee and directed entry of judgment against Goddard & Blum, St. Paul is judicially estopped from asserting that he did not earn a fee in the Servidone/Texas matter. *See id.* at 19.

In response, St. Paul asserts that the state court action did not address Mr. Goddard's entitlement to a "personal fee." *See St.* Paul's Reply Memorandum of Law at 20. Furthermore, St. Paul claims that neither Goddard & Blum nor Mr. Goddard even attempted to raise the issue of enforceability of Mr. Goddard's contingent bonus agreement. *See id.* More specifically, St. Paul argues that at the hearing before the state court, Mr. Dineen stated that one of the issues which in his view was not before the state court was the validity of Mr. Goddard's retainer agreement. *See id.* St. Paul also contends that Goddard & Blum filed affidavits specifically acknowledging that the validity of Mr. Goddard's retainer agreement was being litigated in this court and not in the state court proceeding. *See id.* Based upon these representations, St. Paul urges that the issue in this case, the validity of Mr. Goddard's personal retainer agreement with Servidone, was not at issue in the state court proceeding and, therefore, St. Paul is not judicially estopped from challenging the validity of that agreement. *See id.* at 20–21.

In addition, St. Paul asserts that the second element of judicial estoppel is not met here because the state court did not rely upon St. Paul's position. *See id.* at 22. In this regard, St. Paul contends that even after it took an assignment of the MEG firm's claims, it argued that the claim under the withdrawal agreement should be calculated at 20% of what Mr. Goddard obtained in the present action. *See id.* at 21. This argument, according to St. Paul, was rejected by the state court when it refused to stay pro-

ceedings, by this court when it refused to stay the state court proceedings, and by the Special Referee when he found Goddard & Blum liable despite not having received any contingent fees in the Servidone/Texas matter. *See id.* at 22. Alternatively, St. Paul asserts that even if the state court had relied upon its argument, that argument is not contrary to its argument in these proceedings. *See id.* In this regard, St. Paul asserts that it has consistently and repeatedly denied the validity of Mr. Goddard's retainer agreement with Servidone. *See id.*

The court's review of the decisions in the state court action leads it to conclude that the issues as well as the agreements under discussion there are entirely different from those present here. First of all, the state courts based their decisions upon the withdrawal agreement to which Mr. Blum was a signatory and a retainer agreement which the MEG firm had with Servidone. To the contrary, these decisions did not in any way consider, nor are they based upon, the January 18, 1989, retainer agreement which is at issue in this case. Moreover, the issue here is not whether Mr. Goddard "earned" his fee per. se but whether he may claim entitlement to this fee pursuant to his retainer agreement with Servidone. Therefore, the court concludes that St. Paul is not judicially estopped from challenging the validity of Mr. Goddard's retainer agreement with Servidone. Accordingly, the court denies Mr. Goddard's motion for summary judgment on this ground.

### IV. Golomb's and Blum's Opposition

In opposition to St. Paul's motion, Mr. Golomb and Mr. Blum assert that it does not matter whether Mr. Goddard was engaged in the unauthorized practice of law because "[a]ny unlawful practice by Mr. Goddard, if any, occurred at a time when Goddard & Blum—not Ray Goddard—'owned' the retainer." *See* Golomb's Memorandum of Law at 14. In support of this position, Mr. Golomb and Mr. Blum contend that

[t]he January 18, 1989 retainer constituted the basis for the formation of Goddard & Blum; Ray Goddard's putting that retainer into the firm was intended to, and did,

provide the business and income to enable it to get started and operate profitably from the very start.... the retainer, the case, and the fee were put into the firm when it was formed—on February 6, 1989.

*See id.* at 13.

On the basis of these assertions, Mr. Golomb and Mr. Blum conclude that "[o]n February 6, 1989, the equitable or beneficial ownership of the retainer vested in Goddard & Blum." *See id.* at 14.

Contrary to Mr. Golomb's and Mr. Blum's assertion, it does matter whether Mr. Goddard's activities on behalf of Servidone, including his entering into a retainer agreement to provide legal services, constituted the unauthorized practice of law. As explained above, such a contract is unenforceable. With respect to their argument that such unauthorized practice does not affect Goddard & Blum's right to fees obtained pursuant to this agreement, they offer no law to support such an assertion. Nor do they direct the court's attention to any legal basis for their conclusion that Goddard & Blum automatically, and apparently without Servidone's knowledge or approval, became the beneficial owner of the retainer agreement at the time of the firm's formation on February 6, 1989.

Although the court has serious reservations about the merits of these claims, given the lack of briefing on the issues raised as well as the fact that the same arguments form the basis of their cross-motion, to which the other parties have not had the opportunity to respond, the court will not address these claims at the present time.

In this regard, the court hereby instructs Mr. Golomb and Mr. Blum to notify the court in writing whether they intend to file a motion addressing these issues within ten days of the date of this order. If they do file such a motion, any papers in support of the same must be filed with the court and served upon opposing counsel no later than **January 9, 1996.** Any papers in opposition to said motion must be filed no later than **January 23, 1996.** The return date for this motion will be **February 6, 1996.** The court will decide this motion on the papers submitted. Thus, counsel need not appear in court on the return date.

## CONCLUSION

For the reasons stated above, the court concludes that Mr. Goddard's activities with respect to his representation of Servidone in the Servidone/Texas matter constituted the unauthorized practice of law in violation of § 478 of the New York Judiciary Law. As such, to the extent that Mr. Goddard bases his claim to the interpleaded funds upon this agreement, such claim must be dismissed.

This conclusion, however, does not entitle St. Paul to receive these funds at the present time. As noted above, Mr. Golomb, Mr. Blum and the Minority Interest of Goddard & Blum have asserted that Goddard & Blum has a claim to these funds pursuant to the January 18, 1989 retainer agreement. Although the court has serious reservations about the viability of this claim, the issue of whether or not Goddard & Blum is so entitled has not been resolved at this time. Until it is, the interpleaded funds must remain in the custody of the court. On the other hand, should Mr. Golomb and Mr. Blum notify the court within the time frame prescribed above that they do not intend to pursue this claim further, the opposing parties may proceed accordingly.

Finally, because Servidone's claims against Goddard & Blum and Mr. Goddard survive their settlement agreement with St. Paul and because St. Paul is not judicially estopped from challenging the validity of Mr. Goddard's retainer agreement with Servidone, the court denies Mr. Goddard's cross-motion for summary judgment.

**IT IS SO ORDERED.**